Filed 12/7/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S089311 |
| v. | ) | |
| | ) | |
| CHRISTOPHER HENRIQUEZ, | ) | |
| | ) | Contra Costa County |
| Defendant and Appellant. | ) | Super. Ct. No. 961902-4 |
| _____ | ) | |

Defendant Christopher Henriquez killed his pregnant wife and their two-year-old daughter.  He stipulated at trial that he killed the victims with malice aforethought, but asserted that the murders were not premeditated and were instead the unplanned result of a fit of rage.  A jury convicted defendant of two counts of first degree murder and one count of second degree murder, found true a multiple-murder special circumstance, and returned a verdict of death.  This appeal is automatic.  (Pen. Code, § 1239, subd. (b).)  We affirm the judgment.

## I. PROCEDURAL HISTORY

On October 10, 1996, the Grand Jury of Contra Costa County indicted defendant Christopher Henriquez for the first degree murder of his wife, Carmen Henriquez (with an enhancement for personal use of a deadly or dangerous weapon), the first degree murder of his daughter, Zuri Henriquez (with an enhancement for personal use of a deadly or dangerous weapon), and the second degree murder of the fetus Carmen was carrying.  (Pen. Code, §§ 187, subd. (a),

1

189, 12022, subd. (b)(1).) The indictment alleged as a special circumstance that defendant committed multiple murders. (*Id.*, § 190.2, subd. (a)(3).) As later amended, the indictment also alleged that defendant had suffered a prior strike for a serious felony in New York. (*Id.*, §§ 667, subd. (e)(1), 1170.12, subd. (c)(1).)

A jury convicted defendant of all charges, found true the alleged enhancements and special circumstance, and returned a verdict of death.

## II. FACTS

### A. Guilt Phase

#### 1. Prosecution Case

Defendant admitted that he killed his pregnant wife and daughter, but denied that he acted with premeditation. Defendant stipulated "1. that he killed each of the alleged victims. 2. that each and all of the killings were unlawful. 3. that each and all of the killings were done with malice aforethought. 4. that each and all of the killings were done willfully." Defendant also stipulated that he had been convicted of second degree robbery in New York on April 27, 1994, served a term of 18 months, and was released on parole on July 28, 1995. Defendant was on parole at the time the murders were committed in August 1996.

In July 1996, Carmen and Zuri spent some time at the home of Carmen's father, Harold Jones. Jones learned that defendant intended to rob banks and called him on the telephone "to relay to him the consequences of — and the effects of robbing banks and the effects it would have on his family and himself." Defendant became "very defensive and boisterous" and said Jones "was intervening in his business." The conversation "deteriorated" and ended quickly. The next day, Jones's wife, Mona Lisa Jones, called defendant "trying to patch things up" and defendant repeated that "[t]his is my business."

2

In mid-July, defendant spoke to Carmen's best friend, Angelique Foster, and said that Carmen "was going crazy telling people that he was . . . going to rob banks . . . ." Defendant was "irritated and angry." Defendant's younger brother, Francisco Henriquez, testified that in the late spring of 1996, defendant had said that he wanted to kill Carmen "because she doesn't listen." About a month before the murders, defendant repeated that if Carmen did not stop talking he would kill her.

Defendant's mother, Deborah Henriquez, testified that defendant told her in July that his neighbor, Gregory Morton, had come to their house with a gun and told defendant that he "should teach his wife not to talk so much." Morton declared that he was not going back to prison, and he did not "like the idea of [Carmen] talking about his business." Carmen took Zuri and fled to her mother's house.

On July 26, 1996, defendant and Morton robbed a bank in San Francisco and obtained $9,054. On July 31, 1996, defendant and Morton robbed another bank in San Francisco and obtained $179,397. Deborah testified that in July 1996, defendant came into some money. Defendant said he had gotten a boxing contract and his manager had given him an advance payment. Defendant told his mother that Carmen did not believe the money came from a boxing contract and instead believed defendant had gotten the money by committing robberies.

Carmen's cousin, Trenice White, testified that Carmen and Zuri stayed with her for three days in July 1996. Carmen seemed abnormal and withdrawn and said that defendant "was into heavy stuff," but did not elaborate.

In August 1996, defendant, Carmen, and Zuri went to Disneyland for several days, accompanied by defendant's mother, sister, and younger brother. Defendant paid for the trip. They returned home on Sunday, August 11, 1996. At

3

the airport, defendant told his mother that he was thinking about going to New York.

Carmen's sister-in-law, Heidi Jones, testified that she spoke to Carmen on the telephone on Monday, August 12, 1996, the day she was killed. Carmen said, "Heidi, things are very bad right now." Heidi heard defendant yelling in the background. Carmen said she had to go and the conversation ended.

On August 12, 1996, the day after they returned from Disneyland, Deborah spoke to defendant on the telephone at about 5:30 p.m. He sounded troubled. Deborah invited him to come to her house. When he arrived, he appeared intoxicated and was incoherent. He looked sick and "a bit dazed." He threw up, began mumbling, "She just doesn't listen," and cried out for Zuri. Defendant's brother, Francisco, said defendant was different than Francisco had ever seen him. Defendant would not talk to Francisco. Francisco speculated at trial that "at this point [defendant] realized what he had done." Defendant would sporadically begin to cry and ask where Zuri was, calling for "Zuzu."

The next morning, Deborah went to work and spoke to defendant on the telephone. She told him she had called Carmen but had not reached her. Defendant said, "Well, she's not going to return your call." When Deborah asked why, defendant said: "Carmen is dead. I killed Carmen." Deborah asked where Zuri was, and defendant replied that he had killed her as well.

Deborah returned home and asked defendant what had happened. Defendant said he and Carmen had argued when they returned from the airport. The next day, he awoke and heard Carmen talking to someone on the telephone. Defendant said, "She just, you know, didn't listen. She just didn't know how not to stop talking about things." Defendant became angry "because she was talking about their business, and it really shouldn't have been talked about." The next

4

thing defendant knew, he was choking Carmen. Zuri woke up. Defendant claimed that while he was hitting Carmen with a hammer, "Zuri got in the way."

Deborah told defendant to go to the police, but defendant said he could not do that because he was on parole. He said that "he would never be in a cage again." After defendant "finished talking about, you know, how bad he felt and everything and the fact that he missed Zuri and he wanted his little girl, he just laid back and he — and then he sat up from the pavement and he says and, 'Oh, by the way,' . . . 'I robbed a bank.' " Defendant said he could not believe he had killed his wife and daughter, but stated he killed Carmen because she "wouldn't stop blabbing her mouth." He had told Carmen he was planning to rob a bank and she was upset. The morning of the murders, he became enraged when "Carmen continued blabbing about his business to her friends." Deborah reported the crimes to the police after defendant left. She told the police she thought defendant might have gone to New York.

Police officers entered defendant's apartment shortly after 2:00 p.m. on Tuesday, August 13, 1996, and found Carmen's body "covered or wrapped in a bed covering." She was lying facedown on a bed in a pool of blood. Her wrists and ankles were bound, and there was a plastic bag near her mouth. Zuri's body was in a large box nearby, also wrapped in a blanket.

An autopsy of Zuri revealed skull fractures caused by at least two blows, possibly from a hammer that was found at the scene. Bruises on Zuri's neck were consistent with strangulation. There were multiple lacerations and abrasions on Zuri's face, some of which could have been inflicted with the clawed end of the hammer.

Carmen's hands were tied behind her back with a telephone cord. Her feet were bound together with shoelaces. She had been manually strangled. Her face was swollen and bruised, consistent with her having been kicked. She had

5

defensive wounds on her arms and two large bruises on her scalp. Carmen was "obviously pregnant" and was carrying an eight-month-old fetus.

Defendant was arrested when he disembarked from an airplane at La Guardia Airport in New York. He was carrying nearly $50,000 in cash. Defendant waived his *Miranda* rights and admitted that he had killed Carmen and Zuri. At the police station, defendant signed a five-page confession in which he admitted having robbed a bank on July 31, 1996, and telling his "wife at length about the robbery." He then took his family to Disneyland. Defendant stated that after they returned, on August 12, 1996, he started arguing with his wife. He continued: "She left the house to cash a check. After my wife left, I suffocated my daughter Zuri, who had been playing. I brought her over to her bed and put the pillow over her face until she was not breathing anymore. I covered Zuri with a sheet completely, and left her there. . . . [W]hen my wife returned, I took the money from her and just started beating her. She is seven months pregnant. I put a plastic bag over her face and kept it there until she was dead. I dragged her body into my daughter's room. I left the body of my wife on the floor and covered her with a quilt. . . . After I killed my daughter and wife, I went to my mother's house . . . ."

The next day, police again interviewed defendant, and he admitted having robbed another bank "about two to four weeks prior to the July 31st robbery." He identified Gregory Morton as his accomplice in the robberies. Defendant also admitted having killed his daughter "by striking her multiple times in the face and head with a hammer." An audiotape of defendant's statement was played for the jury.

On August 5, 1998, while defendant was awaiting trial, defendant and four other inmates attempted to escape custody by prying open a cell window. The

prosecution argued the escape attempt showed defendant's consciousness of his guilt.

### 2. Defense Case

Defendant did not testify. Defendant called as a witness Dr. Donald Dutton, a psychologist and expert in domestic violence, who testified that most spousal homicides are preceded by a history of domestic violence and separations and reconciliations. One of the characteristics of such homicides is "overkill," which "refers both to sort of clumsiness, and also refers to a number of strikes or blows that are more than sufficient to kill a person. It seems to be driven largely by an explosion of rage from the perpetrator." Dr. Dutton explained that "the majority of spousal homicide is really rage-generated. And the rage, in most cases, seems to have to do with the either real or perceived abandonment of the perpetrator by the victim. That is, she's leaving. . . . [T]hese men have some ego deficits that makes that kind of separation absolutely intolerable. So they go into a volcanic rage state." Just before a homicide, he testified, these men generally "have spotty recollection of what's happening . . . . It could range from complete amnesia to what I would call spotty recollection. . . . Many are in such high arousal stages at that point that they're virtually in an altered state . . . ." After a homicide, "what most typifie[s] the posthomicidal state [is] complete confusion. And these men [are] stunned by what they had done. They [are] literally just kind of walking around [and] not thinking clearly at all."

In a study of 90 spousal homicides, Dr. Dutton found that "78 of these things seemed to be spontaneous acts that occurred on the spot." If a weapon was used in one of the homicides in the study, "typically it was something that was found in the house." If no weapon was used, "it basically meant the woman, in most cases, was strangled. Killed with a man's [bare] hands." Dr. Dutton

7

testified, "Bearing on the issue of overkill, here we get the number of blows or stabs. There was a range of 5 to 25, talking about knife stab wounds." There was evidence of "estrangement" in "two-thirds of these cases. They were either arguing about the woman leaving, or she had just left."

The defense introduced evidence showing that on July 27, 1996, Carmen saw a psychiatrist at a nearby hospital. Upon discharge, she was given the telephone number of a battered women's shelter.

## B. Penalty Phase

### 1. Prosecution Case

Carmen's father, Harold Jones, described his relationship with Carmen and Zuri and the impact of their deaths on him. Carmen's best friend, Angelique Foster, and Carmen's sister-in-law, Heidi Jones, also described their relationships with Carmen and Zuri and the impact of their deaths on them. Carmen's older brother, Valen Jones, described Carmen's childhood and recounted his relationships with Carmen and Zuri and the impact of their deaths on him.

Bank employees described the details of defendant's robberies. A teller and the assistant manager at the bank defendant robbed on July 26, 1996, testified, as did a teller and the branch manager of the bank defendant robbed on July 31, 1996. The branch manager of the bank defendant robbed on July 31 testified that she suffered posttraumatic stress after the incident and would no longer work "in a branch type environment." An FBI agent testified that on August 16, 1996, defendant confessed to both bank robberies and described in detail how he and his accomplice, Gregory Morton, committed them.

Frank Pecoraro testified that defendant robbed him in New York City on January 9, 1994, around 4:00 a.m. He was walking down the sidewalk near his apartment when defendant approached him and asked a question. Before he could

8

answer, defendant punched him in the face, knocking him down a flight of stairs. Defendant jumped on top of him and punched him numerous times. Defendant stole Pecoraro's wallet and fled when a neighbor intervened.

Lutgarda Lugo testified that between 1:00 and 2:00 a.m. on January 2, 1994, she was driving across the Macombs Dam Bridge in New York City, near Yankee Stadium, when she saw two people drop something off the bridge. She screamed and said to her companions, "Let's see if we can find a policeman nearby." They found New York Police Officer John Reilly at about 1:50 a.m. and led him to where a 46-year-old Black man later identified as Jerome Bryant was lying. Officer Reilly called for an ambulance. Bryant was pronounced dead at the hospital after hours of unsuccessful efforts to resuscitate him. An autopsy revealed that Bryant was alive when he was thrown from the bridge and died from multiple blunt force injuries to the head and torso. Photographs of the crime scene were shown to the jury.

On August 14, 1996, after being arrested in New York, defendant confessed to his participation in the attempted robbery and murder of Bryant. Defendant said that he, his brother Timothy, and a friend saw the victim leaving a bank and followed him to a bridge near Yankee Stadium, planning to rob him. Defendant said, "My brother and a friend threw this guy from the bridge down to me on the street below. The guy was dead and had nothing on him, so . . . we all left him there."

### 2. *Defense Case*

Defense investigator Sandra Coke testified that she compiled defendant's family history. Psychologist Dr. Dutton, who had testified at the guilt phase, reviewed police reports and other documents relating to the murders and concluded that defendant was "almost a sort of textbook example of the men" he

9

had studied who had killed their wives. Dr. Dutton testified that defendant "grew up in an abusive home where he was shamed and where he had no secure attachment," which "led to the anger and rage that he felt in intimate relationships . . . ." Defendant's mother was "cold and rejecting" and failed to provide a "safe haven." Defendant's father was "emotionally unstable, ha[d] a heroin addiction, [was] physically violent, [got] into fights in the street, and [took] out a lot of physical violence both on his wife and his three oldest boys." Dr. Dutton described defendant's crimes as an "[u]nexpected episode of violent, impulsive, acting out behavior, which [was] not well thought out, for no obvious purpose or personal advantage."

Defendant's mother, Deborah Henriquez, described her life raising six children as a single mother. She described defendant as "a good son" and "a nice brother to his siblings."

Dr. Leonti Thompson, a psychiatrist, met with defendant several times at the county jail starting on October 4, 1996. He reported that defendant "was able to converse quite rationally. He had a fairly good recollection of his past history. He had a recollection of the offense and his mental status during that time. The most noticeable feature that I saw of his mental reaction was his continued expressions of remorse. His disbelief that he had done what he had done."

Dr. Jonathan Mueller, a psychiatrist, reviewed police reports regarding the murders, defendant's life history, psychiatric reports about defendant, and other documents, including Carmen's diary. Dr. Mueller found "a clear and strong history of psychiatric disorders, mental illness on both the mother and the father's side of the family. There was also a very strong history of violence that ran in the family . . . ." Dr. Mueller concluded that defendant has a psychiatric disorder that "resembles an Intermittent Explosive Disorder, because there are discre[te] episodes of violence, and the violence seems to be out of proportion to the

10

provocation. . . ." Defendant "had the nickname of Rage, apparently, or Silent Rage . . . ." But "he most closely fits into the Borderline Personality Disorder, the hallmarks of which are intense fear of abandonment with frantic efforts to avoid that, and extreme reaction to perceived abandonment or rejection or criticism. Secondly, great difficulty controlling anger; and thirdly, emotional swings and oscillations, so his affect is up and down . . . ."

Defendant's younger brother, Edwin Henriquez, testified that he "looked up to" defendant, who "was a kind brother" and "a role model."

Renee and Charles Dunn testified that they attended the same church in New York as defendant's family and met defendant when he was 15 years old. Renee said that defendant "was an excellent example of a teenager. Very mannerly, very good home training, very devoted to his faith . . . ." Charles added that defendant had "an exemplary reputation" in the church. Viola Goldenberg also was a member of defendant's church in New York. When defendant was a teenager, he ran errands for Goldenberg, including picking up her paychecks. She described defendant's behavior as "exemplary."

Kenneth Henley, too, attended the same church as defendant and tutored him in Bible studies. Henley said: "Christopher was a very loving young man. I was impressed with him after I first met him because of his sincerity. He was respectful to older people . . . his biggest vice was wanting to stay out and play basketball too late. That was it."

Modesto Henriquez, testified that his brother Edward, defendant's father, abused drugs and alcohol. He was not able to control his temper and "would beat a person down in the street for saying the wrong thing." Edward "wasn't a nice person." He "was very . . . verbally abusive, short tempered, loud . . . ."

11

# III. DISCUSSION

## A. Pretrial

### 1. Deprivation of the Right to a Jury Drawn from a Fair Cross-Section of the Community

Defendant contends he was denied his federal and state constitutional rights to a jury drawn from a fair cross-section of the community because African-Americans were underrepresented in the master jury list and jury venire. Defendant fails to establish a constitutional violation.

### a. Background

On November 20, 1998, defendant filed a motion to quash the jury master list and jury venire. He alleged that he was "of African-American descent" and that a "conservative estimate of the African-American jury-eligible population in Contra Costa County totals 8.1% of the general jury-eligible population" while a survey of 42 jury panels conducted in 1996 and 1997 showed that "the number of African-Americans who appeared for jury duty represented only 4.8% — a comparative disparity of 40%, and an absolute disparity of 3.3% . . . ."[1] Defendant argued that this disparity is "systematic" because "the source lists used

---

[1] " 'Absolute disparity' is the difference between the underrepresented group's percentage in the jury-eligible population and the group's percentage in the actual jury venire. [Citation.] Thus, if Blacks are 3.2 percent of the eligible population, but only 2.1 percent of the actual venire, the absolute disparity is 3.2 percent minus 2.1 percent, or 1.1 percent[age points]. 'Comparative disparity' measures the *percentage* by which the number of group members in the actual venire falls short of the number of group members one would expect from the overall 'eligible population' figures. Thus, if 32 of every 1,000 members of the presumptively eligible population are Black, but only 21 of every 1,000 persons who actually make up the venire are Black, the comparative disparity is the percentage by which 21 falls short of 32, or approximately 34.4 percent." (*People v. Anderson* (2001) 25 Cal.4th 543, 564-565, fn. 6.)

to prepare the juror list from which venires are drawn do not fairly represent the African-American jury eligible population . . . [,] the criteria for merging the two source lists, and for purging duplicate names . . . , and the failure to adequately follow-up [with] potential jurors summoned who do not respond, results in a list of qualified jurors which is underrepresentative of the African-American jury-eligible population in the county."  Defendant also contended that the disparity was the result of "an historical pattern of residential and employment segregation of the county's African-American population in the East and West ends of the county," from which there is limited public transportation to the Martinez courthouse where felony trials are held.

In his opposition, the Contra Costa County Jury Commissioner acknowledged that appellate courts have noted that African-Americans are underrepresented in Contra Costa County venires, but denied that the underrepresentation was the result of the jury selection process.  The jury commissioner described that process as follows:  "The names of prospective jurors are obtained by merging a list of registered Contra Costa County voters with a DMV list of licensed drivers and identification cardholders who are age 18 or older and who are county residents.  The lists are obtained, merged and purged of duplicates twice annually. . . .  [¶]  Jurors who are summoned and fail to appear are sent a follow up notice by the jury services office."

On February 10, 1999, this case and seven other cases challenging the jury selection process in Contra Costa County were ordered to be assigned "to an outside judge."[2]  The Judicial Council selected Judge Thomas Reardon of the

---

[2]     In addition to the present matter, the hearing concerned *People v. Lawrence Stringer*, No. 982011-9; *People v. Kermith Harbison*, No. 990285-9; *People v. Vincent  Bailey*, No. 990301-4; *People v. Brian Williams*, No. 971571-5; *People v.*

*(Footnote continued on next page.)*

Alameda County Superior Court to hear the motion to quash. An evidentiary hearing began on May 17, 1999.

The parties stipulated that the court would consider the reporter's transcript and exhibits received in evidence in *People v. Aldridge Currie* (Super. Ct. Contra Costa County, 1998, No. 962407-3). The trial court in that case denied the defendant's motion to quash the master jury list and jury venire, and the Court of Appeal affirmed. (*People v. Currie* (2001) 87 Cal.App.4th 225, 228.) The defendant presented "statistical evidence that the number of African-Americans in Contra Costa County totaled 8.4 percent of the county's adult population, but that only approximately 4.6 percent of the persons who appeared for jury duty in response to summons were African-Americans." (*Id.* at p. 233.) Both the trial court and the Court of Appeal adopted the results of a study performed by Dr. Robert Ross at Currie's behest that "revealed that less than 5 percent (4.6 to 4.8 percent) of the jurors called in a sample period were African-Americans." (*Id.* at p. 233, fn. 2.) The Court of Appeal, however, also accepted "the Attorney General's additional argument that [the court] must use the roughly 8 percent (8.1 percent) figure for the percentage of African-American *adults* in the county's population, rather than an 8.4 percent figure, which included all persons regardless of age." (*Ibid.*)

The Court of Appeal in *Currie* acknowledged that underrepresentation of African-Americans in Contra Costa jury venires "is a long-standing problem, dating back at least 20 years." (*People v. Currie*, *supra*, 87 Cal.App.4th at p. 235.)

*(Footnote continued from previous page.)*

*Carl Cotright*, No. 990211-5; *People v. Antonio Warren*, No. 990566-2; and *People v. Lamonta Ramey*, No. 981648-9.

But the court held that Currie had failed to make a prima facie showing "that the disparity was caused by the 'systematic exclusion' of African-American jurors." (*Ibid*.) To the contrary, the court held that "the procedures employed by the county to summon and select persons for jury service are, according to the undisputed evidence, entirely race-neutral." (*Id*. at p. 236.) *Currie* upheld the trial court's finding that the disparity in representation was attributable to the "disproportionately high rate of failure to appear by those summoned for jury service from the county's Bay Judicial District, which is located in the City of Richmond" (*ibid*.), and in which approximately 75 percent of the African-American population in Contra Costa County resided (*id*. at p. 234). The court concluded: " 'Statistical underrepresentation of minority groups resulting from race-neutral . . . practices does not amount to "systematic exclusion" necessary to support a representative cross-section claim. [Citations.]' [Citation.]" (*Id*. at p. 236.)

In evaluating defendant's claim in this case, the trial court considered additional testimonial evidence. The Jury Commissioner, represented by county counsel, called as a witness Assistant Jury Commissioner Sherry Dorfman. She testified that in 1999, she began administering a questionnaire to all prospective jurors appearing countywide that collected information including the jurors' residential zip code, gender, "ethnicity with respect to Hispanic origin," and racial self-identification. The questionnaire also asked if the jurors were licensed drivers or identification card holders and registered voters. The 1990 census showed that the percentage of African-Americans in the population of Contra Costa County was 8.4 percent. Dorfman's expert opinion was that, at the time of the hearing, there was a "relatively small underrepresentation of African-Americans in the jury venire as compared to the County population." In particular, Dorfman testified that "[t]he absolute difference between the percentage of African-Americans

appearing in the jury venire [and the percentage of African-Americans in Contra Costa County] is 1.1 percent[age points]." She further testified that the absolute disparity for African-American citizens who are over the age of 18 years is 2.71 percentage points.

The defense called as a witness Dr. Peter Sperlich, who testified as an expert in statistical analysis. Dr. Sperlich questioned Dorfman's 1999 study because it included subjects called for jury service during only a two and a half-month period. Dr. Sperlich calculated an "absolute disparity of 2.71 percentage points [and] a comparative disparity of 27.24 percent," which he termed "a very substantial underrepresentation." The trial court noted: "The Jury Commissioner's year-end reports show that the residents of the Bay District, Richmond, at least in 1998, . . . 43 percent of those who got a jury summons in that judicial district didn't show up, or failed to appear, which is the highest of the four judicial districts. The Delta district, which is Pittsburg, was 30 percent, approximately. Mt. Diablo 20 percent, and Walnut Creek 15 percent."

After considering both the *Currie* record and the additional evidence introduced at the hearings in these consolidated cases, the trial court denied defendant's motion to quash the jury venire. The court found "that the adult population of African Americans in this county rests probably somewhere in the low eight percent." The court relied on "the Ross study" because the subjects in the Ross study "self-identified" their race, as did the subjects in the census. The court gave less weight to Dorfman's questionnaire because it permitted individuals to "check more than one box," which is different from "the census data I have available to compare it against, which requires that folks check only one box." Finding the Ross survey to be "the best survey," the trial court found that the adult population of African-Americans in Contra Costa County was 8.4 percent while the percentage of African-Americans in the jury pool was 4.8 percent. This

16

absolute disparity of 3.6 percentage points produced a comparative disparity "somewhere around 43 percent," which the court found "is statistically significant, whether . . . I do a comparative disparity or an absolute disparity . . . ."[3]

The trial court ruled, however, that defendant had not carried his burden to show that this underrepresentation was the result of systematic exclusion and thus "constitutionally impermissible." The court found that the evidence did not support defendant's argument that the disparity was caused by the distance between the district in which the majority of African-Americans in Contra Costa County live and the district in which felony trials were held. The trial court noted that the Jury Commissioner's office "ha[d] taken steps to improve the system," such as adopting a "one day one trial" system of jury duty and using "proportional summoning." Although the court questioned whether the office was "doing everything [it] could do" to address the underrepresentation of African-Americans in the jury pool, the court ultimately concluded that defendant had not carried his burden to demonstrate that the underrepresentation was likely caused by any feature of the jury selection system.

### b. Discussion

A criminal defendant has a "right, under the Sixth and Fourteenth Amendments, to a petit jury selected from a fair cross section of the community." (*Duren v. Missouri* (1979) 439 U.S. 357, 359 (*Duren*); see *People v. Howard* (1992) 1 Cal.4th 1132, 1159.) "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged

---

[3] Counsel later pointed out that "Dr. Ross found that the African American representation in the survey was 4.6" percent and the court agreed. Using the 4.6 percent figure results in an absolute disparity of 3.8 percentage points and a comparative disparity of 45 percent.

17

to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren*, at p. 364.) If a defendant establishes a prima facie violation, the burden then shifts to the state to show "attainment of a fair cross section to be incompatible with a significant state interest." (*Id.* at p. 368.)

The parties do not dispute that African-Americans are a "distinctive" group for purposes of *Duren*'s first prong. (See *People v. Bell* (1989) 49 Cal.3d 502, 526.) As for the second prong, the parties dispute whether defendant has carried his burden of demonstrating that the proportion of African-Americans in the jury pool is not "fair and reasonable" relative to their numbers in the community. The evidence before the trial court showed there was a 3.8 percentage point absolute disparity and a 45 percent comparative disparity. The Attorney General argues that courts have previously held that "numbers much higher than those . . . were insufficient to show disparity." In *People v. Ramos* (1997) 15 Cal.4th 1133, 1156, for example, this court concluded that "a range of absolute disparity between 2.7 and 4.3 percent[age points] and of comparative disparity between 23.5 and 37.4 percent" is not constitutionally significant. (See also *People v. Cunningham* (2015) 61 Cal.4th 609, 652 [an absolute disparity of 7.2 percentage points and a relative disparity of 30 percent "are not constitutionally significant"].) But the trial court here found a comparative disparity of roughly 43 percent, which exceeds the range we have found insufficient in prior cases. Our cases do not definitively identify the point at which such a disparity becomes constitutionally significant. And as we have repeatedly noted, "the [United States] Supreme Court has not yet spoken definitively on either the means by which disparity may be measured or the constitutional limit of permissible disparity." (*People v. Bell*,

18

*supra*, 49 Cal.3d at pp. 527-528, fns. omitted; *People v. Burgener* (2003) 29 Cal.4th 833, 856-857.) The high court has since affirmed that none of its cases "specifies the method or test courts must use to measure the representation of distinctive groups in jury pools," while noting that both "[a]bsolute disparity and comparative disparity measurements . . . can be misleading when, as here, 'members of the distinctive group comp[ose] [only] a small percentage of those eligible for jury service.' " (*Berghuis v. Smith* (2010) 559 U.S. 314, 329.)

As in our prior cases, we need not resolve these issues here. The trial court found there was "a pattern of underrepresentation" that was "statistically significant," but questioned whether it was "of such a degree that it rises to a constitutional level." The trial court ultimately concluded that defendant's fair cross-section claim failed because he did not satisfy the third prong of the *Duren* test. We agree with the trial court's conclusion. Even if defendant has carried his burden of showing that African-Americans are underrepresented in Contra Costa County juries, he has not carried his burden of showing that this underrepresentation is the product of systematic exclusion.

Defendant's primary argument is that the long-standing history of underrepresentation of African-Americans in Contra Costa County jury pools, combined with the county's "failure to take steps to remedy this problem," itself demonstrates systematic exclusion. But as defendant acknowledges, our cases have held that "[a] defendant does not discharge the burden of demonstrating that the underrepresentation was due to systematic exclusion merely by offering statistical evidence of a disparity. A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process." (*People v. Burgener*, *supra*, 29 Cal.4th at p. 857.) "Where, as here, a county's jury selection criteria are neutral with respect to the distinctive group, the defendant must identify some aspect of the manner in which those criteria are

19

applied that is not only the probable cause of the disparity but also constitutionally impermissible. [Citation.] . . . Speculation as to the source of the disparity is insufficient to show systematic exclusion [citation], as is evidence the disparity is unlikely to be a product of chance [citation] or has endured for some time [citation]." (*Id.* at p. 858.)

Defendant relies for his argument on language in *Duren* stating that the defendant in that case had established systematic exclusion by demonstrating that women were underrepresented in jury pools "not just occasionally, but in every weekly venire for a period of nearly a year." (*Duren*, *supra*, 439 U.S. at p. 366.) This, the court said, "manifestly indicates that the cause of the underrepresentation was systematic — that is, inherent in the particular jury-selection process utilized." (*Ibid.*) But as the remainder of the discussion makes clear, the defendant in *Duren* had identified a jury selection practice at the root of the persistent disparity: a county's administration of a state-law exemption permitting women to opt out of jury service. (*Id.* at p. 367.) The court did not hold that statistics demonstrating that a particular group is consistently underrepresented in the jury pool, standing alone, suffice to demonstrate that the group has been systematically excluded.

Defendant does point to certain features of the Contra Costa County jury selection system that, in his view, are responsible for the underrepresentation of African-Americans in the jury pool. First, he points to the county's use of Department of Motor Vehicles (DMV) and voter registration lists. Defendant contends that "since it is well known that minorities register to vote at lower rates than Whites and that poorer people are less likely to own automobiles," the county should also have used "other sources, for example utility company lists." This court has previously rejected a similar argument. (*People v. Ochoa* (2001) 26 Cal.4th 398, 428.) As we explained in *Ochoa*, "[t]he challenged state action must

20

be the probable *cause* of the disparity." (*Ibid.*) Here, defendant has made no showing that the county's use of the DMV and voter registration lists was the probable cause of the disparity he challenges, nor has he shown that any other available list would have produced a jury venire that was more representative of the population.

Defendant next contends that African-Americans were systematically excluded because all felony trials are held in the Martinez courthouse, which "is located far from the centers of the African-American population," and because the county fails to provide reasonable public transportation. The evidence does not substantiate defendant's argument. The trial court noted that the failure-to-appear rate for residents of the Bay District—in which approximately 75 percent of the African-American population of Contra Costa County resided—was about the same whether they were summoned to appear in the Martinez courthouse or the Richmond courthouse, which is located in the Bay District: "The Jury Commissioner's year-end reports show that the residents of the Bay District . . . 43 percent of those who got a jury summons in that judicial district didn't show up" in the Martinez courthouse, whereas the failure to appear rate for Bay residents summoned to the Richmond courthouse was 42.5 percent. As the trial court later added: "The statistics would tell us it's not geography and transportation. . . . [T]he failure-to-appear rate is . . . roughly the same for Bay residents, when they are summoned to come to Martinez as when they are summoned to come to Richmond."

Finally, defendant points to the county's failure to follow up when a potential juror does not respond to an initial summons. But defendant has not shown that the county's failure to engage in more aggressive follow-up is a cause of underrepresentation of African-Americans in the jury pool in Contra Costa County. In rejecting a similar claim, the Court of Appeal in *People v. Currie*,

21

*supra*, 87 Cal.App.4th at page 237, footnote 5, wrote: "[T]here is no merit in appellant's suggestion that the county was required to conduct more extensive follow-up of African-American jurors who do not appear, in order to coerce their attendance. The county currently takes reasonable steps to follow up and urge attendance for all jurors. A more coercive and harassing approach, which singles out African-American jurors, would seemingly raise serious questions of fairness and discrimination." Like the Court of Appeal, we cannot conclude that the county's failure to conduct more aggressive follow-up is an improper feature of the jury selection process that resulted in the systematic exclusion of African-American jurors.

### B. Guilt Phase

#### 1. Motion to Exclude Evidence of an Uncharged Murder

The trial court ruled that if Dr. Dutton testified that defendant's murders of his pregnant wife and daughter were consistent with a "rage killing," rather than premeditated murder, then the prosecution would be permitted to impeach Dr. Dutton with evidence that defendant had participated in an uncharged attempted robbery and felony murder in 1994, as well as committing other crimes involving violence. As a result, Dr. Dutton testified in general terms about "rage killings" of wives by their husbands, but did not offer his opinion that defendant's homicides were consistent with such a rage killing. Defendant argues that the trial court's ruling was incorrect as a matter of state evidentiary law, deprived him of a fair trial by precluding him from presenting critical evidence in his own defense, and violated his "Sixth Amendment and Fourteenth Amendment due process rights to present a defense and to a fair trial, his Sixth Amendment right to effective counsel and an impartial jury and his Eighth Amendment right to a fair,

22

reliable sentencing determination, and the state constitutional analogs to the federal Constitution." Defendant's arguments lack merit.

### a. Background

Before trial, the prosecutor stated that if a penalty phase was conducted, he would introduce evidence that defendant admitted planning and participating in the attempted robbery and murder of Jerome Bryant in New York City in 1994. The prosecutor stated, however, that he did not intend to introduce this evidence at the guilt phase in the case-in-chief, but might use it on rebuttal or on cross-examination. At the court's urging, the prosecutor promised not to refer to this evidence during the guilt phase without first warning the court and defendant.

Later, defendant filed a pretrial motion "to exclude from the 'guilt' phase of the jury trial evidence of any other crimes attributed to him but not charged in this case." The court ruled that the prosecution could not introduce evidence of Jerome Bryant's murder in the prosecution's case-in-chief and ordered that the prosecution "make no reference to the Bryant murder either on cross-examination or rebuttal without first approaching the Bench . . . ."

On December 7, 1999, the day before the prosecution rested its case-in-chief, defendant filed a motion requesting an ex parte, in camera hearing to present an offer of proof regarding the testimony of Dr. Dutton. The motion stated: "Whether the defense will call Dr. Donald Dutton as a witness at trial will depend on this court's ruling as to admissibility of the Bryant incident in any cross-examination of Dr. Dutton . . . ." The motion recounted that after defendant was arrested, he told a New York City police officer that in 1994, in New York, he, his brother, and a friend attempted to rob a man who had just left a bank. Defendant told the officer that his brother and a friend threw the victim off a bridge and defendant searched the body after the victim landed.

23

Defendant made an offer of proof stating that "Dr. Donald Dutton is an expert on the subject of domestic violence, the personality of male batterers, and the etiology and causes of wife assault and femicide." The offer of proof stated that Dr. Dutton had reviewed "certain materials, including statements of the defendant, pertinent police reports, and other material regarding the background and development of the defendant" and had a "professional expert opinion regarding the mental condition of Mr. Henriquez on August 12th, 1996, and how that mental condition affected conduct on that date." Defendant stated that Dr. Dutton's opinion would "assist the jury in reaching their own conclusion about the mental state of the defendant regarding the issue of premeditation and deliberation."

Dr. Dutton was called as a witness outside the presence of the jury. He testified that his study of "spousal homicides" revealed "that they're characterized typically by a history of domestic violence that culminates, leads up to, precedes the homicide. . . . That the homicide is frequently almost sort of an inexplicably violent act, frequently referred to as 'overkill.' That is, there's so much rage that's released in an act of spousal homicide, because so much rage builds up on an intimate bond, that the amount of violence that occurs is frequently more than would be required to kill a person." "[T]he men who sort of express this huge explosion of rage are in a somewhat . . . 'disassociated state.' They're confused after the fact. . . . And I think this is indicative of the fact that when they're in this rageful state they're in — what might be considered almost an altered state of consciousness . . . ."

Based on materials describing the crime scene, Dr. Dutton opined: "[I]t appeared to be what I would call a very disorganized crime scene. It . . . didn't show much planning. For example, the weapons were weapons that were largely every-day household items that appeared to have been grabbed on the spot. There

24

was a considerable amount of violence that was committed, what I would consider to be overkill. . . . [T]his was a homicide that had the earmarks of what I would call an 'estrangement homicide' or an 'abandonment homicide' that seemed to be precipitated by intimate issues, and had the characteristics of intimate rage associated with it."

Dr. Dutton stated that defendant's "relationship with his wife was highly conflictual, where there were periods of physical abuse, certainly a lot of verbal abuse that occurred during the relationship. There were a number of separations where his wife left, sometimes taking the baby with her. And then a return to reconcile with Mr. Henriquez." Dr. Dutton opined, "So two of the kind of hallmark characteristics of what I would call a spousal estrangement homicide appeared to be evident in the evidence that I reviewed." Dr. Dutton also read Carmen's diary and notes written by Carmen found in a kitchen drawer that "looked . . . like an escape plan." Dr. Dutton opined, "She had a battered women's shelter number on there, and a number of statements that she appeared to have written to herself. . . . So it looked to me like two things were going on here: There had been a history of abuse, and it looked as though she was planning to exit the relationship." In Dr. Dutton's view, the fact that a wife has left or is planning to leave "makes it about 600 percent more likely" that a spousal homicide will occur.

Dr. Dutton testified that he knew about defendant's participation in the attempted robbery and murder of Jerome Bryant in New York in 1994. Although it was not "completely irrelevant," Dr. Dutton stated that the attempted robbery and murder of Bryant did not affect his opinion about the "causes of the conduct of Mr. Henriquez on August 12th, 1996." Dr. Dutton testified: "I would simply see the characteristics of the homicide that occurred where Carmen Henriquez was the victim, the facts surrounding those homicides, as really fitting a particular

25

pattern. And things that occurred on the outside would be marginally related to that set of facts." Nor would the fact that defendant later discussed killing a guard in order to escape from jail cause Dr. Dutton to alter his opinion: "I still see the pattern . . . as a spousal homicide with all the particular and specific earmarks of a spousal homicide." Dr. Dutton acknowledged that "an act of intimate rage is not necessarily inconsistent with something that's planned."

Dr. Dutton also considered it relevant that defendant's older brother, Michael, was "incarcerated for spousal homicide." Dr. Dutton testified that this fact played a role in the formulation of his opinion because "it was part of sort of the entire examination of family background and things that had occurred during [defendant's] upbringing, and I suppose the fact that they were raised in a family that I would say was kind of a breeding ground for violence."

On cross-examination, Dr. Dutton explained the difference between "the impulsive batterer" and "the instrumental batterer." The impulsive batterer is "reactive" and "their violence is predominantly within the relationship." The impulsive batterer is unable "to modulate . . . the emotions that stem from physiological arousal." The instrumental batterer is "lacking in conscience . . . [and] uses violence . . . both within the relationship and outside the relationship . . . to achieve some instrumental goal."

In distinguishing between impulsive and instrumental batterers, Dr. Dutton agreed that he would "want to see whether the violence centered predominantly within the relationship or outside the relationship" and whether "there's a history of any other antisocial behavior." Dr. Dutton explained: "If I ran across a person that . . . exhibited a lot of antisocial characteristics, as Mr. Henriquez did, one of the things I'd want to know right off the top was something about their emotional makeup. And if I saw that there was a kind of a consistent emotional makeup in the commission of antisocial acts, outside the relationship and within the

26

relationship—that is, that they were kind of a cold, affectively flat person, who could use violence really without being upset by the use of the violence, with a person that was totally lacking in empathy—I might come to one conclusion . . . . If, on the other hand, I notice that the use of violence outside the relationship seemed to have one sort of motivational pattern behind it, but the within-relationship behavior was characterized by extreme volatility, emotion that was leading to, as I said before, break ups and reconciliations, if I saw a disproportionate rage response that indicated an inability to modulate arousal, where the emotional reactions were quite extreme within the relationship, then I would come to the conclusion, as I did in this case, that the motivation and pattern of the violence within the relationship was differentially motivated than the violence outside the relationship."

The court held that if Dr. Dutton testified that defendant murdered his wife as an impulsive act of rage rather than an act of "goal-oriented violence," the People could introduce evidence of defendant's participation in the Bryant killing, evidence of violence or threats of violence in connection with the bank robberies, and evidence of defendant's willingness to kill a guard in order to effectuate escape. The trial court explained: "[A]ll of these were instances of goal-oriented violence. Each of these have value, in and of themselves, and a synergism in connection with each other, in terms of their value, for allowing a jury to evaluate the opinion of the expert in this case." The court noted that defendant did not dispute that he unlawfully killed the victims with malice aforethought. Rather, it noted, "The only issue in this case is: Is it an impulsive act of domestic rage or intimate rage, or was it the product of some deliberation and premeditation?" The court concluded that evidence of the Bryant murder would be "extremely probative on a vital if indeed not key issue, and may be the only issue in this case, and . . . it's not substantially outweighed by the prejudicial value that it has."

27

In light of the court's ruling, defense counsel stated he would have Dr. Dutton "testify to general principles that are at play in situations involving spousal homicide . . . without reference to this particular defendant" and without expressing an opinion that "this particular defendant acted impulsively in light of all the evidence he had examined here." Counsel, however, expressed the "great concern of the defense . . . because we have retreated to something far from what we think we are entitled," and which "would be far more powerful and far more helpful to the defense."

### b. *Discussion*

Defendant argues that the trial court erred in ruling that evidence of the attempted robbery and murder of Bryant would be admissible to impeach Dr. Dutton if he testified that defendant's subsequent killing of his pregnant wife and daughter was the unplanned product of "intimate rage" rather than premeditated murder, because the Bryant murder was irrelevant to Dr. Dutton's expert opinion and the prejudicial impact of the evidence far outweighed its probative value.

We review the trial court's ruling for abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.) Evidence Code section 721, subdivision (a), provides that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his or her qualifications, (2) the subject to which his or her expert testimony relates, and (3) the matter upon which his or her opinion is based and the reasons for his or her opinion." " 'A party "may cross-examine an expert witness more extensively and searchingly than a lay witness, and the prosecution [is] entitled to attempt to discredit the expert's opinion. [Citation.] . . ." ' [Citations.] . . . ' " 'Once an expert offers his opinion, . . . he exposes himself to the kind of

inquiry which ordinarily would have no place in the cross-examination of a factual witness.  The expert invites investigation into the extent of his knowledge, *the reasons for his opinion including facts and other matters upon which it is based* [citation], and which he took into consideration; and he may be "*subjected to the most rigid cross-examination*" *concerning* his qualifications, and *his opinion and its sources* [citation].'  (Italics added.)" ' "  (*People v. Rodriguez* (2014) 58 Cal.4th 587, 647.)

Defendant argues that evidence of the Bryant homicide was irrelevant because Dr. Dutton was aware of it and it had no effect on his expert opinion.  But the credibility of an expert witness may be challenged based on the sources of information the expert relied on to form his or her opinion.  (*People v. Rodriguez*, *supra*, 58 Cal.4th at pp. 646-647 ["Under state law, an expert such as a psychiatrist may rely on various sources of information, including hearsay, in forming an opinion, and a party may question that expert about that information to test the expert's credibility."].)  The prosecution was entitled to explore Dr. Dutton's knowledge of the Bryant homicide in an attempt to discredit the expert's opinion. (*Id*. at p. 647 ["the prosecutor was entitled to explore with [the expert] occasions in which he had reason to believe defendant had lied, to attempt to discredit his reliance on defendant's other statements, and to attempt to discredit [the expert]'s opinion . . . ."]; *People v. Nye* (1969) 71 Cal.2d 356, 375 [proper for prosecutor to ask defense expert witness whether he would change his opinion " 'if certain additional facts were known to him' "].)  It was for the jury to determine whether the circumstances of the Bryant homicide were relevant and affected the credibility of Dr. Dutton's testimony.

The trial court did not abuse its discretion in ruling that evidence of the Bryant murder could be admitted to impeach Dr. Dutton if he testified that the charged murders were an unplanned product of "intimate rage" and, thus, were not

premeditated. Dr. Dutton had testified that among the factors he considered in determining whether the charged murders resulted from an impulsive act of rage or were planned acts to achieve a goal were whether defendant's prior violent acts "centered predominantly within the relationship or outside the relationship," and whether "there's a history of any other antisocial behavior." Dr. Dutton stated that he would consider whether defendant's prior violent acts showed that defendant "could use violence really without being upset by the use of the violence" and was "a person that was totally lacking in empathy." Evidence that defendant had participated in the murder of Jerome Bryant for the purpose of robbing him would have been highly relevant to impeach Dr. Dutton's testimony.

We agree with the trial court that this conclusion finds support in our decision in *People v. Hendricks* (1988) 44 Cal.3d 635, which addressed an analogous issue. Hendricks was charged with robbing and murdering James Parmer and Charleston Haynes. The prosecution introduced evidence that Hendricks was a male prostitute. He had a paid sexual encounter with Parmer's roommate and, a few days later, broke into the apartment and shot Parmer six times at point-blank range. Hendricks later had a paid sexual encounter with Haynes and then shot him five times at point-blank range.

After the prosecution rested its case-in-chief, Hendricks made an offer of proof that psychologist Linda Carson would testify in support of the defense's theory that the murders were not premeditated because in committing the murders, "defendant acted out of 'homosexual rage,' " which was described as an "irresistible impulse springing from fear that he was in fact homosexual." (*People v. Hendricks*, *supra*, 44 Cal.3d at pp. 642, 641.) The trial court ruled that if Dr. Carson so testified, the prosecution would be permitted to impeach her with evidence that near the time of the charged murders, Hendricks also murdered two

30

other gay men in Los Angeles and a woman in Oakland. The defense rested without presenting any evidence. (*Ibid.*)

*Hendricks* held that the trial court did not err: "Other-crimes evidence may be used to impeach the testimony of an expert witness. [Citations.] Because an expert witness may be cross-examined more extensively and searchingly than a lay witness, the court has broad discretion to admit such evidence for impeachment. [Citations.] [¶] No abuse of discretion appears here. Because Dr. Carson's 'opinion . . . was at odds with the evidence introduced by the prosecution,' the prosecutor was entitled to 'attempt to discredit' it." (*People v. Hendricks*, *supra*, 44 Cal.3d at p. 642.) The same is true here: The prosecution was entitled to discredit Dr. Dutton's opinion with evidence of defendant's goal-oriented violence.

Nor did the trial court abuse its discretion in ruling that the probative value of the proffered evidence would have outweighed its prejudicial effect. " ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. . . . " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" [Citation.] [¶] The prejudice that section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.] In other words, evidence should be excluded as unduly

prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]" (*People v. Doolin*, *supra*, 45 Cal.4th at pp. 438-439.)

In most cases, the danger of inflaming the emotions of the jury by admitting evidence of an uncharged murder is that the jury will conclude that the defendant committed the charged murder because he has a propensity to kill. But in this case, defendant had stipulated that he murdered the victims; the question was whether he planned the murders. Here, evidence that defendant had previously been involved in the Bryant homicide would have been highly relevant to the jury's consideration of Dr. Dutton's testimony that defendant killed his victims as an impulsive act of rage rather than an act of "goal-oriented violence." The probative value of this evidence was not substantially outweighed by the risk that the jury would consider the evidence for a different, illegitimate purpose.

Finally, we reject defendant's claim that the trial court's ruling violated his federal constitutional rights: "The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1014.)

### 2. *Attempt to Escape from Jail*

Defendant argues that he was denied due process and his right under the Eighth and Fourteenth Amendments "to a reliable adjudication at all stages of a death penalty case" because the trial court erred in ruling that the prosecution could admit evidence at the guilt phase of the trial that defendant had attempted to escape from jail.

32

In response to defendant's pretrial motion "to exclude from the 'guilt' phase of the jury trial evidence of any other crimes attributed to him but not charged in this case," the prosecution argued that defendant's participation in an attempted jail escape was admissible to show consciousness of guilt. The trial court agreed. During trial, the parties stipulated "that on August 5th, 1998, five inmates, including Christopher Henriquez, using part of a cell bunk attempted to pry open a cell window to escape from the custody of the Main Detention Facility of Contra Costa County where they were housed awaiting trial."

Defendant argues that because there was no dispute that he murdered the victims, and the only contested issue at the guilt phase of the trial was whether the murders were premeditated and deliberate, consciousness of guilt was irrelevant. Therefore, defendant argues, there was no reason to admit the escape evidence. Defendant cites *People v. Anderson* (1968) 70 Cal.2d 15, 32, which held that while evidence that the defendant tried to " 'cover up' " a murder "may possibly bear on defendant's state of mind *after* the killing, it is irrelevant to ascertaining defendant's state of mind immediately prior to, or during, the killing."

As defendant acknowledges, we rejected a similar claim in *People v. Moon* (2005) 37 Cal.4th 1, in which the defendant was charged with premeditated murder and admitted killing the victims. We said: "Although defendant's theory of the case was that he was guilty of only second degree murder, he pleaded not guilty to the charges, thereby putting in issue 'all of the elements of the offenses.' [Citation.] Even if he conceded at trial his guilt of some form of criminal homicide, 'the prosecution is still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent.' [Citation.] We have previously rejected the notion that the flight instruction is improper when an accused concedes the issue of identity and merely contests his mental state at the time of the crime. [Citation.]" (*Id*. at p. 28.)

33

Nor did the trial court abuse its discretion under Evidence Code section 352 because the prejudicial effect of this evidence substantially outweighed its probative value.  As we held in *People v. Kipp* (2001) 26 Cal.4th 1100, 1126, where an attempted escape "involve[s] no overt violence," "the risk of undue prejudice [is] slight."  (Accord, *People v. Carrasco* (2014) 59 Cal.4th 924, 963.)

### 3. *Admission of the Victim's Statement*

Defendant argues that the trial court erred in admitting evidence that three weeks before her death, defendant's wife, Carmen, told her cousin that defendant "was into 'heavy stuff.' "  Defendant asserts that this error violated his rights to due process and to confront and cross-examine witnesses, as well as his "right to a reliable determination of guilt and penalty as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and analogous provisions of the California Constitution."  We find no error.

### a. *Background*

During trial, defendant filed a motion in limine asking the court to "rule on the admissibility of any statements attributed to Carmen Henriquez, the defendant's wife and one of the victims in this case, that the prosecutor intends to introduce."  Just before the testimony of Carmen's cousin, Trenice White, the prosecutor represented that White would testify that on July 19, 1996, Carmen came to stay at her apartment for a few days.  White would testify that Carmen "seemed upset, said Christopher was into heavy stuff but didn't elaborate further . . . ."

The trial court ruled that Carmen's out-of-court statement that defendant was "into heavy stuff" was admissible for the nonhearsay purpose of showing her state of mind that she believed her husband was involved in "heavy stuff," specifically bank robberies.  The evidence also was admissible as a spontaneous

34

statement because it was made under the stress or excitement of Carmen realizing that her husband was involved in bank robberies. The trial court then clarified its ruling: "If [the statement] were offered for the truth of the matter asserted that [defendant] was into heavy stuff, I believe there is enough here to indicate it's a spontaneous statement, falls within the exception of the hearsay rule. However, my princip[al] ruling is that it is based on the fact that in my view it is not hearsay, it is being offered to establish that Carmen had knowledge of the bank robberies and was talking about them in this form of defendant being into heavy stuff to third parties. And . . . when considered for those purposes, it's not even hearsay. It's . . . state of mind of Carmen and communication of that state of mind to a third party, which [in] my view are relevant to the overall motive contentions of the People in this case."

Later, the court revisited the issue and explained: "The nonhearsay purpose really has nothing to do with Carmen's state of mind. It has to do with the fact of the communication made by Carmen to a third party, and how that might corroborate the People's motive." The court again undertook to clarify its ruling, terming its earlier reliance on Carmen's state of mind "unfortunate": "It's not really so much state of mind . . . it's evidence of a communication made by Carmen to a friend. And to that extent, it corroborates . . . that defendant had complained . . . about Carmen talking to her friends." The evidence that Carmen had spoken to her cousin about the bank robberies "tends to corroborate that defendant was concerned about that. . . . It's really not state of mind; it's simply evidence of a communication."

The prosecutor called White as a witness. Her testimony was brief. She stated she was Carmen Henriquez's first cousin. On July 19, 1996, Carmen and her daughter, Zuri, arrived at White's apartment and stayed for three days.

35

Carmen seemed "abnormal," "withdrawn," and "stressed." Carmen told White that defendant "was into heavy stuff" but did not elaborate.

### b. Discussion

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (*Id*., subd. (b).) "We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

Here, White's testimony that Carmen told her that defendant "was into heavy stuff" was admissible for the nonhearsay purpose of showing that Carmen had told someone that defendant was planning a bank robbery. Carmen's statement to her cousin that defendant was "into heavy stuff" was not offered to prove defendant actually was "into heavy stuff" or planning bank robberies, but to corroborate other evidence showing that defendant was upset that Carmen was talking about "his business," which provided a motive for the murder. The statement was admissible for this purpose. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 697.)

In *Mendoza*, the defendant killed his stepdaughter after his wife told him that his stepdaughter had accused him of molesting her. This court upheld the admission of the stepdaughter's accusations, explaining that the prosecutor had not offered the accusations "to prove defendant actually molested her, but rather to prove defendant was aware of the accusations and to explain defendant's motive for killing" his stepdaughter. (*People v. Mendoza*, *supra*, 42 Cal.4th at p. 697.) Thus, we explained, the statements were not hearsay and "were properly admitted to explain defendant's state of mind, motive, and conduct." (*Ibid*.; see also *People*

*v. Sandoval* (2015) 62 Cal.4th 394, 427-428 [gang leader's statement at gang meeting that " 'We're not killing enough people or our rivals' " admissible for the nonhearsay purpose of showing the defendant's mental state when he shot and killed a police officer later that day].)

Defendant argues that *Mendoza* is distinguishable because there is no evidence in the present case that defendant was aware of Carmen's statement. But there was circumstantial evidence that defendant was aware of Carmen's statement, because he later complained to Carmen's best friend, Angelique Foster, that Carmen "was going crazy telling people that he was . . . going to rob banks . . . ." The lack of direct evidence that defendant was aware of Carmen's statement affects its weight, but not its admissibility.

### 4. Jury Instructions on Consciousness of Guilt

Defendant argues the trial court violated his "Sixth, Eighth and Fourteenth Amendment rights to due process, a fair trial, a jury trial, equal protection, and reliable jury determinations on guilt, the special circumstance and penalty, as well as their state constitutional analogs" by giving the jury instructions regarding consciousness of guilt based on CALJIC Nos. 2.03, 2.04, and 2.52. First, the court instructed the jury they could consider "as a circumstance tending to prove a consciousness of guilt" that "before this trial, [the] defendant made a willfully false or deliberately misleading statement concerning any of the crime[s] for which [he] is now being tried" (see CALJIC No. 2.03) and "that defendant [attempted to] escape from jail after being charged with the crimes in this case" (see CALJIC No. 2.04). The court also instructed the jury that "[t]he flight of a person immediately after the commission of a crime . . . is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty" (see CALJIC No. 2.52). The trial court added

37

to each pattern instruction: "[I]t is for you to determine whether such conduct in fact shows [consciousness of] guilt, and, if so, guilt of what crime or degree of crime."

Defendant argues the challenged instructions were unnecessary because the trial court had instructed the jury, pursuant to CALJIC Nos. 2.00 and 2.01, "that it may draw inferences from the circumstantial evidence." He further contends the challenged instructions were "impermissibly argumentative" in that they invited the jury to draw inferences favorable to the prosecution, and that the instructions improperly "permitted the jury to use the consciousness-of-guilt evidence to infer not only that [defendant] committed the murders, but that he had done so with premeditation and deliberation."

The Attorney General argues defendant forfeited this issue by failing to object at trial. Penal Code section 1259 provides that an appellate court may "review any instruction given . . . , even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." We have held that a claim that the trial court erroneously instructed the jury pursuant to CALJIC No. 2.52 affects the defendant's substantial rights. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7.)

We have previously considered and rejected the argument that CALJIC No. 2.03 unnecessarily duplicates the circumstantial evidence instructions. (*People v. Page* (2008) 44 Cal.4th 1, 50.) We explained in *Page* "that '[t]he cautionary nature of [CALJIC No. 2.03] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citations.]' [Citation.]" (*Page*, at p. 50.) Noting that the jury in that case might have erroneously concluded that evidence that the defendant had lied about his whereabouts was sufficient to show he committed the crime, this court concluded that "CALJIC No. 2.03 specifically addresses this risk by

38

acknowledging the inference that may be drawn from a defendant's willfully false or misleading statement, but precluding a finding of guilt based solely upon a willfully false or misleading statement. Thus, CALJIC No. 2.03 is not merely duplicative of CALJIC No. 2.00 and CALJIC No. 2.01, which address more general principles of evidence." (*Page*, at p. 50, fn. omitted.) The same rationale applies to CALJIC Nos. 2.04 and 2.52, which similarly address the inferences that may be drawn from evidence of evasive behavior following the charged offense. (See *People v. Breaux* (1991) 1 Cal.4th 281, 304 [CALJIC No. 2.03 does not violate due process]; *People v. Mendoza* (2000) 24 Cal.4th 130, 179-180 [CALJIC No. 2.52 does not violate due process].)

Further, defendant acknowledges that this court has "found California's consciousness-of-guilt instructions not to be argumentative" (see, e.g., *People v. Page*, *supra*, 44 Cal.4th at pp. 50-51; *People v. Nakahara* (2003) 30 Cal.4th 705, 713, and cases cited therein) and not to "permit irrational inferences concerning the defendant's mental state" (see *Page*, at pp. 51-52; *Nakahara*, at p. 713; *People v. Hughes* (2002) 27 Cal.4th 287, 348, and cases cited therein). Our cases have explained that these instructions are not argumentative because they "properly ' "pinpoint[] the theory of the defense" ' " rather than " 'improperly impl[y] certain conclusions from specified evidence . . . .' " (*People v. Jackson* (1996) 13 Cal.4th 1164, 1223.) The cases have also explained that "[n]o reasonable juror would conclude that CALJIC No. 2.03's guidance concerning an inference that may be drawn from a defendant's dishonest statements made *after* the commission of a crime establishes what the defendant was thinking at the time of the commission of the crime." (*Page*, at p. 51.) Defendant urges this court to reconsider these cases but provides no persuasive reason for doing so.

The instructions in this case regarding consciousness of guilt may be distinguishable from those in the cases discussed above because the trial judge

augmented each of the challenged instructions, telling the jury it is "for you to determine whether such conduct in fact shows consciousness of guilt, *and, if so, guilt of what crime or degree of crime*." (Italics added.) But defendant does not argue that the additional language makes any difference to the analysis. In any event, even if we were to assume that the instructions were erroneous, any error would be harmless. The evidence admitted to show consciousness of guilt was irrelevant to determining the degree of the crime and the augmented instruction made clear it was for the jury to determine whether the evidence showed the degree of the crime. It is likely the jury realized that this evidence had no effect on whether the murders were premeditated and, even if the jury did consider this evidence when determining the degree of the crime, the effect would be exceedingly weak and thus nonprejudicial.

### 5. *Jury Instruction on Motive*

Defendant contends the trial court's instruction based on CALJIC No. 2.51 permitted the jury to determine guilt based upon motive alone and improperly shifted the burden of proof to defendant to establish his innocence, depriving him of his federal constitutional rights to a "fair jury trial, due process, and a reliable verdict in a capital case under the Fifth, Sixth, Eighth and Fourteenth Amendments and their state constitutional analogs." Defendant acknowledges that we have previously considered and rejected his claims.

The instruction stated: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant in not guilty." We repeatedly have rejected defendant's argument "that this instruction allowed the jury to determine guilt based on the presence of an alleged motive only and

40

thereby lessened the prosecution's burden of proof." (*People v. Nelson* (2016) 1 Cal.5th 513, 553; see *People v. Rogers* (2006) 39 Cal.4th 826, 889 [CALJIC No. 2.51 does not violate due process].)

### 6. *Separate Guilt and Penalty Juries and Sequestered Voir Dire*

Defendant asserts the trial court erred in denying his requests for a separate penalty phase jury, for "sequestered, individualized 'death qualification' " voir dire, and "to permit limited voir dire prior to the penalty phase." These errors, defendant contends, deprived him of his federal constitutional rights "to voir dire, an impartial jury, a fair trial, due process and reliable guilt, special circumstance and penalty determinations under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and their state constitutional analogs."

Before trial, defendant correctly anticipated that evidence that he had participated in the attempted robbery and murder of Jerome Bryant would not be admitted at the guilt phase of the trial but would be admitted at the penalty phase. Defendant asserts this was "a primary reason" he asked that a new jury be selected if a penalty phase was necessary or that dual juries be empaneled. He further asked that only the penalty phase jury be "death qualified," and that "any death qualification be conducted on an individual, sequestered basis." His goal was to ensure that "jurors who would be deciding the appropriate penalty after hearing about an additional murder could be asked about its impact without tainting jurors at the guilt phase of the case." The trial court denied these requests, observing that Penal Code section 190.4, subdivision (c), "expresses a clear legislative intent that at least where good cause does not require otherwise, that both the guilt and the penalty phase of a capital trial will be tried by the same jury." The court noted that having a single jury is a more efficient use of judicial resources and the jury

41

that determined the defendant's guilt is "in a better position to determine what the appropriate punishment should be."

The trial court did not abuse its discretion. Penal Code section 190.4, subdivision (c), provides that unless the trial court has discharged the jury that determined the defendant's guilt, the same jury that "convicted the defendant of a crime for which he may be subject to the death penalty . . . shall consider . . . the penalty to be applied . . . ." "In *People v. Nicolaus* (1991) 54 Cal.3d 551 . . . , we recognized that Penal Code section 190.4, subdivision (c), 'expresses a clear legislative intent that both the guilt and penalty phases of a capital trial be tried by the same jury.' [Citation.] There, we held that the 'mere desire' of defense counsel 'to voir dire in one way for the guilt phase and a different way for the penalty phase' 'does not constitute "good cause" for deviating from the clear legislative mandate . . . .' " (*People v. Rowland* (1992) 4 Cal.4th 238, 268; see also *People v. Lucas* (2014) 60 Cal.4th 153, 325.) Here, as in our prior cases, defendant's wish to conduct voir dire differently at the penalty phase does not provide sufficient cause to deviate from the procedure set out in Penal Code section 190.4. (See also *People v. Bennett* (2009) 45 Cal.4th 577, 600 [unitary jury does not violate the federal Constitution].)

The trial court also denied defendant's request to voir dire prospective jurors individually regarding their views on the death penalty, noting that "most of this information is being elicited by form of a written questionnaire, which they will be answering at home," and promising that "it will be made clear to the jurors that if they want to ask any question outside the presence of the other jurors, they're entirely welcome to that. I'll honor their request. . . . [I]f they feel they can speak more freely about any subject matter by simply meeting with us . . . outside the presence of the jury, I will honor that request."

42

The trial court did not abuse its discretion. As defendant acknowledges, Proposition 115, which took effect on June 6, 1990, amended Code of Civil Procedure former section 223 to read as follows: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper . . . . Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases."[4] This portion of Proposition 115 "abrogated the former rule requiring individual, sequestered voir dire in capital cases . . . ." (*People v. Taylor* (2010) 48 Cal.4th 574, 604.) "[T]here is no federal constitutional requirement that a trial court conduct individualized, sequestered voir dire in a capital case. [Citations.] Nor [does] the trial court's denial of the motion for individual, sequestered voir dire violate any of defendant's rights under the state Constitution or other state law." (*Id.* at p. 606; see also *People v. Jackson* (2016) 1 Cal.5th 269, 357-358.)

Nor did the trial court abuse its discretion by denying defendant's request to permit "limited voir dire prior to the penalty phase." Defendant argues that "because the jury was never asked about the impact of an unrelated murder . . . the trial court should have found good cause for permitting such questions after the guilt phase." The trial court noted that similar requests for additional voir dire following the guilt phase of a capital trial were denied in *People v. Taylor* (1990) 52 Cal.3d 719, 737-738 and *People v. Malone* (1988) 47 Cal.3d 1, 27-28. More recently, this court upheld the denial of a similar request in *People v. Hart* (1999) 20 Cal.4th 546. This court said: "The subject of the jurors' attitudes had been

---

**4**    The statute was further amended after the trial in the present case. (See Stats. 2000, ch. 192, § 1, p. 2216.)

examined thoroughly during the voir dire examination conducted at the outset of the guilt phase of the trial. There was nothing unusual about the prosecution's properly noticed intention to introduce evidence, at the penalty phase, of an additional, unadjudicated murder. [Citation.] To permit a convicted capital defendant to delay commencement of the penalty phase proceedings on such a speculative basis would contravene the purpose of [Penal Code] section 190.4, subdivision (c). The trial court did not err in denying defendant's request to re-voir dire the jury." (*Id.* at pp. 640-641.) The same is true in this case.

### 7. *Victim Impact Evidence*

Defendant contends that admitting victim impact evidence of three members of Carmen's family and Carmen's best friend, and the prosecutor's call for vengeance based upon this testimony, "unduly inflamed the jury and resulted in a fundamentally unfair trial and unreliable sentencing determination in violation of appellant's Sixth, Eighth and Fourteenth Amendment rights and their state constitutional analogs."

Carmen's father, Harold Jones, her sister-in-law, Heidi Jones, her older brother, Valen Jones, and her best friend, Angelique Foster, described their relationships with Carmen and Zuri and the impact of their deaths on them. Valen Jones also described Carmen's childhood. Defendant argues the trial court erred by admitting victim impact testimony by "non-family members, evidence beyond the defendant's knowledge at the time of the crime, cumulative testimony by several witnesses, and evidence as to how family members learned about the crime," but recognizes this court has considered and rejected these arguments and "raises them here for purposes of preservation."

Our cases have held that, "[u]nless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim and the

44

community is relevant and admissible under [Penal Code] section 190.3, factor (a), as a circumstance of the crime. [Citation.] The federal Constitution bars victim impact evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. [Citation.]" (*People v. Brady* (2010) 50 Cal.4th 547, 574.) "Victim impact evidence . . . is not limited to family members, but may include the effects on the victim's friends . . . ." (*Id*. at p. 578.) "We have approved victim impact testimony from multiple witnesses who were not present at the murder scene and who described circumstances and victim characteristics unknown to the defendant." (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183.) Victim impact testimony of six witnesses was found not to be excessive in *People v. Simon* (2016) 1 Cal.5th 98, 139, 140. Testimony that many members of the victim's family cried when they learned she had been murdered " 'concerned the kinds of loss that loved ones commonly express in capital cases.' " (*People v. Taylor*, *supra*, 48 Cal.4th at p. 646.) The trial court did not err in admitting the victim impact evidence introduced in this case.

### 8. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by calling for vengeance on behalf of the victims' family near the end of her argument to the jury at the penalty phase. The prosecutor said: "One other thing I want to talk about is vengeance. . . . It has a legitimate role in our society. . . . [T]his man's life should be taken in retribution, and yes, I mean retribution, in punishment for the lives he took. . . . Yes, there is a lot of vengeance involved. We are saying that he did something so terrible, so heinous, that he has forfeited his right to live." The prosecutor later returned to this theme: "We are not allowing the Jones family . . . to take personal vengeance on a defendant . . . . In return, they, the victims' family, are entitled to vengeance, plain and simple, from the state because they are

not allowed to get it themselves." Defendant objected on the ground that "[i]t suggests that there are views of victims' family. There is no evidence of any views of the victims' family." The court sustained the objection "[i]n so far as it does suggest that," and directed the prosecutor to "[c]omport yourself accordingly." On appeal, defendant contends the argument was an improper appeal to vengeance.

In our recent decision in *People v. Sánchez* (2016) 63 Cal.4th 411, 483, we considered a challenge to a prosecutor's argument on the ground that it improperly appealed to vengeance. In *Sánchez*, the prosecutor "argued to the jury that the defense attorneys would ask for mercy for their clients, but that the prosecution asked instead for justice. She noted that crime victims are not permitted themselves to seek vengeance for the crimes—that was what the criminal justice system is for. She went on to argue, 'we owe the victims in this case vengeance as part of our system of justice and as sanctioned by the laws of our state, and that you swore to uphold as jurors in this case in determining the penalty.' " (*Ibid*.) We held the argument was proper: " '[P]rosecutorial references to community vengeance, while potentially inflammatory, are not misconduct if they are brief and isolated, and do not form the principal basis for advocating the death penalty.' (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1178 . . . .) 'We noted in *Zambrano* that it is not error to argue "that the death penalty, where imposed in deserving cases, is a valid form of community retribution or vengeance—i.e., punishment—exacted by the state, under controlled circumstances, and on behalf of all its members, in lieu of the right of personal retaliation." ([*Zambrano*], at p. 1178.)' " (*People v. Sánchez, supra*, at p. 484.) We concluded that "[a]rguing that 'we owe the victims in this case vengeance as part of our system of justice' did not violate this rule." (*Ibid*.)

Much as in *People v. Sánchez,* the prosecutor's references to vengeance in this case were brief and isolated and they did not form the principal basis for urging the death penalty. Toward the end of an argument that occupies nearly 70 pages of the reporter's transcript, the prosecutor briefly referred to community vengeance: She argued that "vengeance is appropriate" and "has a legitimate role in our society," adding that defendant's "life should be taken in retribution, . . . in punishment for the lives he took." Defendant did not object to these references to community vengeance and no misconduct appears.

The prosecutor later returned to the subject of vengeance, however, arguing that "the victims' family are entitled to vengeance . . . from the state because they are not allowed to get it themselves." Defendant objected and the trial court sustained the objection. The prosecutor did not mention vengeance again.

Defendant argues that these references were impermissible because they "explicitly and emphatically called for vengeance on behalf of the victims' family." We have previously held that a prosecutor may not argue that the victim's family asks for the death penalty. (See *People v. Smith* (2003) 30 Cal.4th 581, 622.) But defendant was not prejudiced by any improper argument because the trial court sustained defendant's objection, warned the prosecutor to avoid making an impermissible argument that "there are views of [the] victims' family," and instructed the prosecutor to "[c]omport [her]self accordingly." No reversible error appears.

### 9. *Photographs of the Victims*

Defendant argues that the trial court violated "state statutory law, and [his] Fifth, Sixth, Eighth, and Fourteenth Amendment rights, as well as his rights guaranteed by article I, sections 7, 15, 17, and 24 of the California Constitution, to

47

a fair trial and a reliable capital sentencing proceeding" by admitting into evidence at the penalty phase photographs of the dead bodies of Carmen and Zuri.

The trial court had excluded these photographs during the guilt phase because defendant had indicated he would stipulate that he willfully and unlawfully killed the victims with malice aforethought. Absent the stipulation, the court would have admitted the photographs at the guilt phase because "they're highly probative of issues of unlawfulness of the killing, of intent to kill, and of malice aforethought. . . . And the[ir] prejudicial value, such as it is, would not substantially outweigh their probative value." The court was careful to point out that this did not mean the photographs would not be admitted into evidence at the penalty phase: "I hope you all understand, I'm not talking about penalty. If we get to the penalty phase in this case, my view is completely different. The People have a right to show the circumstances of the crime."

At the penalty phase, the trial court permitted the prosecutor to admit one photograph of Carmen and one of Zuri, finding that any prejudicial value was outweighed by the probative value to show "the gruesome physical consequences of the murders here in question." The court later clarified the photographs of the victims as "they appeared after their death tell in ways that words could never do, the gruesome consequences of the unlawful acts that were perpetrated by the defendant, and are something that are properly to be considered by the jury in determining what the appropriate penalty is."

Defendant acknowledges that we held in *People v. Bonilla* (2007) 41 Cal.4th 313, 353-354: " 'The admission of allegedly gruesome photographs is basically a question of relevance over which the trial court has broad discretion.' [Citations.] The further decision whether to nevertheless exclude relevant photographs as unduly prejudicial is similarly committed to the trial court's discretion: 'A trial court's decision to admit photographs under Evidence Code

48

section 352 will be upheld on appeal unless the prejudicial effect of such photographs clearly outweighs their probative value.' [Citations.] Notably, however, the discretion to exclude photographs under Evidence Code section 352 is much narrower at the penalty phase than at the guilt phase. This is so because the prosecution has the right to establish the circumstances of the crime, including its gruesome consequences ([Pen. Code,] § 190.3, factor (a)), and because the risk of an improper guilt finding based on visceral reactions is no longer present."

Our conclusion in *Bonilla* that the photographs of the murder victim in that case were admissible applies equally here: " ' " ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant." ' " ' [Citation.] Likewise here. But as unpleasant as these photographs are, they demonstrate the real-life consequences of [the defendant]'s actions. The prosecution was entitled to have the jury consider those consequences. The trial court's exercise of discretion to admit them was neither statutory nor constitutional error." (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 354.) We therefore reject defendant's argument.

### 10. *Evidence that Defendant Would Kill a Guard to Escape*

On rebuttal at the penalty phase, the prosecutor introduced testimony of a former jail guard who had monitored a conversation in which defendant told a fellow inmate that he would kill a guard in order to escape. Defendant argues that admitting this testimony "rendered [his] trial fundamentally unfair and resulted in an unreliable, arbitrary, and non-individualized sentencing determination in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights and their state constitutional analogs." Former Deputy Sheriff Tom Lawrence testified that on August 23, 1998, while defendant was in jail awaiting trial, defendant had a conversation with fellow inmate Joshua Puckett in a recreation area that former

49

Deputy Lawrence was monitoring using an internal public address system. Puckett described an earlier escape he had attempted, which led them to discuss the layout of the jail facility and the best way of escaping. Defendant said that during the night watch there was only one deputy on duty, rather than two, and it would be easy for him to kill the deputy and escape unnoticed. Puckett disagreed, but defendant "was insistent that it was worth the risk to try to kill the deputy, if it would lead to his escape."

Dr. Leonti Thompson, a psychiatrist, testified that defendant expressed remorse for his crimes. Evidence that defendant was willing to kill again to escape was relevant to rebut evidence that he felt remorse for his crimes. (*People v. Bonilla*, *supra*, 41 Cal.4th at p. 356 [evidence of lack of remorse is admissible at the penalty phase].)

### 11. Jury Instructions Concerning Mercy

Defendant claims the trial court deprived him of "his rights to a fair and reliable penalty determination, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and the applicable sections of the California Constitution" by refusing to instruct the jury that it could consider mercy in determining the appropriate penalty.

The trial court refused to give the following instruction that defendant requested: "A mitigating circumstance or factor does not constitute a legal justification or excuse that lessens factual guilt for the offense in question. A mitigating circumstance or factor is something about Christopher Henriquez or about the offenses, which in fairness, sympathy, compassion or mercy, may be considered in extenuating or reducing the defendant's degree of moral culpability or which justifies a sentence of less than death."

The trial court instructed the jury to disregard those instructions given during the guilt phase "which prohibit you from considering pity or sympathy for the defendant." The court instructed the jury it "shall take into consideration, among other things, pity and sympathy for defendant, insofar as you find that it is warranted by the evidence." The court also told the jurors they could "take a lenient or tolerant view of the defendant and/or his conduct."

Defendant acknowledges that "[t]his Court has never found the failure of a trial court to instruct a jury regarding mercy to be error." We stated in *People v. Caro* (1988) 46 Cal.3d 1035, 1067: "Defendant contends that there is a crucial difference between pity, sympathy, and mercy, inasmuch as the first two are sentiments whereas the third implies action. We do not agree, however, that instructions to *consider* various factors, including sympathy for the defendant, could leave a jury with any ambiguity as to its power and duty also to act on such considerations." (See also *People v. Montiel* (1993) 5 Cal.4th 877, 943 ["A jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed that it may exercise 'mercy.' "].)

Indeed, we held in *People v. Lewis* (2001) 26 Cal.4th 334, 393, that the trial court did not err in refusing to instruct that jury that it could " 'exercise mercy on behalf of the defendant' ": "We have cautioned that ' "the jury must 'ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase.' [Citation.] The jury may not act on whim or unbridled discretion." ' [Citation.] 'The unadorned use of the word "mercy" implies an arbitrary or capricious exercise of power rather than reasoned discretion based on particular facts and circumstances.' "

In *People v. Boyce* (2014) 59 Cal.4th 672, 706-707, we upheld a trial court's refusal to give an almost identical instruction, holding the requested instruction was "duplicative of the CALJIC instructions given." We added: "The

words 'sympathy' and 'compassion' are functional synonyms. [Citation.] Defendant fails to articulate a meaningful distinction between them. As for mercy, we repeatedly have cautioned against using that word in the penalty phase instructions, explaining, '[t]he unadorned use of the word "mercy" implies an arbitrary or capricious exercise of power rather than reasoned discretion based on particular facts and circumstances.' " (*Id*. at p. 707.)

We observed in *Boyce* that "the court did not foreclose defense counsel from urging the jury to show sympathy and mercy to defendant." (*People v. Boyce*, *supra*, 59 Cal.4th at p. 707.) Defendant asserts that the same is not true here, pointing to the following comments made by the court to counsel during a discussion of proposed jury instructions: "[I]f the People were to argue, or you were to argue to the jury, 'Ladies and gentlemen of the jury, even if you do the weighing that's called upon by the statute, even if you find that the aggravating circumstances outweigh the mitigating circumstances, I am asking you to be merciful. Give him life anyhow. Be merciful,' that's what mercy means, to disregard. To accord to someone some sort of a punishment other than the one that he or she is entitled to under the law. And if you're using the word in that sense, I would stop that argument. That's erroneous."

The trial court did not impermissibly restrict defense counsel's argument. The court was not ruling on an objection to an argument proffered by defense counsel but was simply using a hypothetical defense argument as an example to illustrate the point he was making. Further, the court correctly concluded that it would be improper for defense counsel to argue that the jury could disregard whether the aggravating circumstances outweigh the mitigating circumstances and "accord to someone some sort of a punishment other than the one that he or she is entitled to under the law." As defendant acknowledges, we held in *People v. Ervine* (2009) 47 Cal.4th 745, 802, that "the trial court did not err in directing the

52

parties to refer to sympathy, pity, or compassion instead of mercy in argument."
This ruling "merely guided the language [counsel] was to use in requesting
leniency, replacing the word 'mercy' with a synonym that did not connote an
emotional response to the mitigating evidence instead of a reasoned moral
response." (*Ibid.*)

### 12. *Nature of the Jury's Sentencing Determination*

Defendant argues that comments made to prospective jurors by the trial
court during voir dire, coupled with a jury instruction based on CALJIC No. 8.88
and limits placed on defense counsel's closing argument at the penalty phase,
"violated the Eighth and Fourteenth Amendments because the jury was left with
guidance that was vague and directionless."

During voir dire, the court instructed: "If you find that the defendant is
guilty of first-degree or premeditated murder and find the alleged circumstances in
this case to be true, then you will consider whether the penalty in this case should
be death or life without possibility of parole. But . . . the law in California does
not provide for a[n] automatic imposition of the death sentence or life without
possibility of parole in any circumstance. . . . If it comes to that, you must find
that the aggravating circumstances outweigh the mitigating circumstances. And
for you to impose life without possibility of parole you must find that the
mitigating circumstances outweigh the aggravating factors or circumstances."
Defendant objected.

Before penalty phase deliberations, the court instructed the jury pursuant to
the then-current version of CALJIC No. 8.88 that: "[Y]ou shall now consider and
take into account and weigh and be guided by the applicable factors of aggravating
and mitigating circumstances upon which you have been instructed. The weighing
of aggravating or mitigating circumstances does not mean a mere mechanical

counting of the factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances, you determine, under the relevant evidence, which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances, that it warrants death instead of life without possibility of parole."

Whether or not the trial court's comments during voir dire perfectly described the jury's task in determining the appropriate penalty, it is clear that the jury was not misled in light of the complete and accurate instructions given just prior to deliberations at the penalty phase. We have held that "CALJIC No. 8.88 adequately guides selection of the appropriate punishment." (*People v. Clark* (2016) 63 Cal.4th 522, 640.)

Returning to his earlier argument that the trial court improperly precluded defense counsel from arguing that the jury could show defendant mercy, defendant argues that the trial court erred in precluding defense counsel from arguing that each juror could "vote for life even if he or she found that aggravation outweighed mitigation." The argument fails for reasons already stated. As previously noted, the trial court was correct to conclude that it would be improper for defense counsel to argue that the jurors could disregard whether the aggravating circumstances outweigh the mitigating circumstances and thereby "accord to someone some sort of a punishment other than the one that he or she is entitled to under the law."

54

### 13. *Challenges to the Death Penalty Statutes*

In order to preserve these issues, defendant briefly raises a number of challenges to the California death penalty statutes that he acknowledges this court previously has considered and rejected. We briefly respond to each of these challenges below.

The death penalty is not unconstitutional for failing to meaningfully narrow the class of murderers eligible for the death penalty. (*People v. Simon*, *supra*, 1 Cal.5th at p. 149.)

"[Penal Code] [s]ection 190.3, factor (a), which permits the jury to consider the circumstances of a defendant's crime in determining whether to impose the death penalty, does not license the jury to impose death in an arbitrary and capricious manner in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. [Citations.]" (*People v. Simon*, *supra*, 1 Cal.5th at p. 149.)

The death penalty is not unconstitutional " 'for failing to require proof beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate punishment.' [Citation.]" (*People v. Simon*, *supra*, 1 Cal.5th at p. 149.) Nor is the jury required to find unanimously and beyond a reasonable doubt that aggravating factors outweigh mitigating factors. (*People v. Jones* (2017) 3 Cal.5th 583, 618-619 (*Jones*).) This conclusion is not altered by the decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), *Ring v. Arizona* (2002) 536 U.S. 584, and *Hurst v. Florida* (2016) 577 U.S. ___ [136 S.Ct. 616] (*Hurst*). (*Jones*, *supra*, 3 Cal.5th at p. 619.)

The federal Constitution does not require that a burden of proof be placed on the prosecution at the penalty phase. (*People v. Jackson*, *supra*, 1 Cal.5th at p. 372.) Nor did the trial court err by failing to tell the jury that there was no burden of proof. (*Id.* at p. 373.) "Unlike the guilt determination, 'the sentencing

55

function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79.)

The federal Constitution does not require that the jury agree unanimously on which aggravating factors apply. (*People v. Jackson*, *supra*, 1 Cal.5th at p. 372.) This does not violate a capital defendant's right to equal protection of the laws. "[C]apital and noncapital defendants are not similarly situated and therefore may be treated differently without violating constitutional guarantees of equal protection of the laws or due process of law [citation] . . . ." (*People v. Manriquez* (2005) 37 Cal.4th 547, 590.)

The federal Constitution does not require that the jury agree unanimously on whether defendant committed unadjudicated criminal activity. (*People v. Simon*, *supra*, 1 Cal.5th at p. 150; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 452.)

The phrase " 'so substantial' " in CALJIC No. 8.88 is not unconstitutionally vague and "the instruction is not unconstitutional for not stating that the central determination is whether the death penalty is 'appropriate.' " (*People v. Lewis* (2008) 43 Cal.4th 415, 533.)

The trial court is not required by the federal Constitution to instruct the jury that it must return a sentence of life without parole if it determines that the factors in mitigation outweigh the aggravating factors. (*People v. Jackson*, *supra*, 1 Cal.5th at p. 373.)

The trial court is not required to instruct the jury that it need not agree unanimously on whether mitigating factors apply. (*People v. Breaux*, *supra*, 1 Cal.4th at p. 314.)

As we have repeatedly held, " ' "[t]he trial court's failure to [instruct] the jury that there is a presumption of life does not violate a defendant's constitutional

56

rights to due process, to be free from cruel and unusual punishment, to a reliable determination of his sentence, and to equal protection of the law under the Fifth, Eighth and Fourteenth Amendments to the federal Constitution." ' [Citations.]" (*People v. Cage* (2015) 62 Cal.4th 256, 293-294.)

Nothing in *Hurst*, *supra*, 577 U.S. ___ [136 S.Ct. 616] causes us to reconsider our holding in *People v. Anderson*, *supra*, 25 Cal.4th at pages 589-590, footnote 14, that "once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt," imposing the death penalty does not constitute an increased sentence within the meaning of *Apprendi*, *supra*, 530 U.S. 466.

The penalty phase jury is not required by the federal Constitution to make written findings. (*People v. Simon*, *supra*, 1 Cal.5th at p. 149.) This conclusion is not altered by the high court's decision in *Hurst*, *supra*, 577 U.S. ___ [136 S.Ct. 616]. (*Jones*, *supra*, 3 Cal.5th at pp. 618-619.)

The federal Constitution does not require intercase proportionality review. (*People v. Simon*, *supra*, 1 Cal.5th at p. 149.)

"California does not deny capital defendants equal protection of the law by providing certain procedural protections to noncapital defendants that are not afforded to capital defendants." (*People v. Simon*, *supra*, 1 Cal.5th at p. 150.)

"International norms and treaties do not render the death penalty unconstitutional as applied in this state." (*People v. Simon*, *supra*, 1 Cal.5th at p. 150.)

### 14. Restitution Fine

At the time of defendant's trial, Penal Code former section 1202.4, enacted in 1995, (section 1202.4) required the court to impose a restitution fine of not less

than $200 and not more than $10,000 if the defendant was convicted of a felony.[5]

The trial court in this case imposed a restitution fine of $6,000. Defendant argues

that under *Apprendi*, *supra*, 530 U.S. 466, it was impermissible for the trial court

to impose any amount above the statutory minimum, and the restitution fine

should therefore be reduced to $200.

*Apprendi* held: "Other than the fact of a prior conviction, any fact that

increases the penalty for a crime beyond the prescribed statutory maximum must

be submitted to a jury, and proved beyond a reasonable doubt. . . . '[I]t is

unconstitutional for a legislature to remove from the jury the assessment of facts

that increase the prescribed range of penalties to which a criminal defendant is

---

[5]     At the time of trial, former section 1202.4, subdivision (a)(3), provided: "The court, in addition to any other penalty provided or imposed under the law, shall order the defendant to pay . . . [¶] (A) A restitution fine in accordance with subdivision (b)."

        Subdivision (b) of former section 1202.4 stated: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine. The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense, but shall not be less than two hundred dollars ($200), and not more than ten thousand dollars ($10,000) if the person is convicted of a felony. . . . In setting a felony restitution fine in excess of two hundred dollars ($200), the court may determine the amount of the fine as the product of two hundred dollars ($200) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."

        Subdivision (c) of the former statute added, "if the court finds that there are compelling and extraordinary reasons, the court may waive imposition of the fine." And subdivision (d) of former section 1202.4 provided: "In setting the amount of the fine pursuant to subdivision (b) in excess of the two hundred dollar ($200) . . . minimum, the court shall consider any relevant factors including, but not limited to, the defendant's ability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered any losses as a result of the crime, and the number of victims involved in the crime."

exposed.' " (*Apprendi*, *supra*, 530 U.S. at p. 490.)  This rule applies to the imposition of fines in criminal cases.  (*Southern Union Co. v. United States* (2012) 567 U.S. 343, 346.)

Here, however, the trial court did not find any fact that increased the prescribed range of penalties to which defendant was exposed.  It instead imposed a fine within the prescribed statutory range.  Its ruling therefore raises no concerns under *Apprendi*.  (See *People v. Kramis* (2012) 209 Cal.App.4th 346, 349-350 [upholding a $10,000 restitution fine imposed under section 1202.4 against a similar *Apprendi* challenge].)  Nor does the high court's subsequent decision in *Alleyne v. United States* (2013) 570 U.S. ___ [133 S.Ct. 2151] cast any doubt on the trial court's ruling.  Overruling *Harris v. United States* (2002) 536 U.S. 545, *Alleyne* held that *Apprendi* applies to judicial factfinding that increases the mandatory minimum sentence for a crime.  (*Alleyne*, at p. 2155.)  The trial court in this case found no facts that increased the mandatory minimum penalty for defendant's crime, so *Alleyne* does not affect the analysis.

### 15.  Cumulative Error

Defendant contends that the cumulative effect of errors at the guilt and penalty phases requires reversal.  "Defendant has demonstrated few errors, and we have found each error or possible error to be harmless when considered separately.  Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment."  (*People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)

## IV. DISPOSITION

The judgment of death is affirmed.

**KRUGER, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J**
**CUÉLLAR, J.**
**LEVY, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Henriquez

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S089311
**Date Filed:** December 7, 2017

_____

**Court:** Superior
**County:** Contra Costa
**Judge:** Peter Spinetta

_____

**Counsel:**

Lynne S. Coffin and Scott Kauffman, under appointments by the Supreme Court; and Oscar Bobrow, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Nanette Winaker, Margo J. Yu, Glenn R. Pruden, Sarah J. Farhat and Roni Dina Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Scott Kauffman
California Appellate Project
101 Second Street, Suite 600
San Francisco, CA  94150-0760
(415) 495-0500

Oscar Bobrow
Deputy State Public Defender
355 Tuolumne Street, Suite 2200
Vallejo, CA  94590
(707) 553-5241

Roni Dina Pomerantz
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5866