Filed 8/20/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JULIUS LEE JACKSON,<br><br>     Defendant and Appellant. | A151676<br><br>(San Mateo County<br>Super. Ct. No. 16-NF-011306-A) |

Defendant Julius Jackson stole chairs from a home-staging business, and the police soon found him with the chairs in a stolen vehicle. A jury convicted him of felony counts of unlawfully taking or driving a vehicle and second degree robbery. The trial court sentenced him to 12 years in prison, composed of two five-year terms for prior felony convictions, a two-year term for robbery, and a concurrent two-year term for unlawfully taking or driving a vehicle.

On appeal, Jackson raises several claims, including that his conviction for unlawfully taking or driving a vehicle under Vehicle Code section 10851, subdivision (a) (section 10851(a)) must be reversed because the vehicle's value was not proven. In the published portion of this decision, we agree. Under *People v. Page* (2017) 3 Cal.5th 1175 (*Page*), which was not decided until after the trial in this case, a defendant cannot be convicted of a felony violation of section 10851(a) based on the *theft* of a vehicle unless the vehicle is worth more than $950. Since the jury here was not so instructed, it could have relied on a legally invalid theory to convict Jackson.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., C., and D.

The presumption of prejudice that arises with this type of instructional error was not overcome. Although there was strong evidence that Jackson unlawfully *drove* a vehicle, which could have supported the felony conviction without regard to the vehicle's value, we cannot conclude beyond a reasonable doubt that the jury unanimously relied on this theory. (See *People v. Chiu* (2014) 59 Cal.4th 155, 167 (*Chiu*).) Accordingly, we must reverse the conviction, and on remand the People will have the choice of either accepting the conviction's reduction to a misdemeanor or retrying the charge as a felony. We reject Jackson's remaining claims and otherwise affirm his convictions.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

On the afternoon of September 12, 2016, an employee of the home-staging business carried four wicker chairs from the company's San Mateo warehouse to a delivery van parked nearby on the street. Realizing that he had forgotten his keys, he left the chairs on the sidewalk by the van and began walking back to the warehouse. He saw a man he later identified as Jackson approaching down the street, which prompted him to return to the van without retrieving his keys.[1] The employee then saw Jackson putting the chairs in a Toyota Land Cruiser.

The employee approached Jackson and told him that the chairs belonged to the home-staging business "[a]nd that if he was taking them, he was stealing them." Jackson "got upset" and turned toward the employee, giving him an "angry" look. At trial, the employee demonstrated the movements Jackson then made. As described for the record, to demonstrate these movements the employee "stood up, clenched his fists, raised them slightly above waist level or belt level and then brought them down, both down in a quick

_____

[1] Shortly after Jackson was arrested, the employee identified him during an in-field showup with "[a] hundred percent" certainty. At trial, the employee was unable to identify Jackson, but he described the man who stole the chairs as being aged 45 to 55 years old, having an Afro, and wearing a Giants jacket and blue jeans. At the time of his arrest, Jackson was 55 years old, had an Afro, and was wearing clothes fitting that description.

2

gesture towards the ground." The employee said that Jackson also puffed out his chest. Jackson then said, "Fuck," but the employee was unsure if the curse was directed at him.

The employee testified that Jackson's movements and curse made him feel "afraid," and he confirmed that he was "afraid that [Jackson] was going to hurt [him] if [he] tried to get the chairs back." The employee explained he wanted to avoid a fight with Jackson because he had an injured shoulder. Instead of trying to reclaim the chairs, the employee used his cell phone to take photographs of Jackson, which were admitted at trial, before returning to the warehouse to seek help.

The theft of the chairs and a description of the Land Cruiser, including its license-plate number, were quickly reported to the San Mateo police. The police contacted the Land Cruiser's registered owner, who lived in San Mateo. Until hearing from the police, the owner did not realize that the Land Cruiser was missing. Although the vehicle was normally parked down the street from the owner's home, the owner's adult daughter, who lived in San Francisco, often used the Land Cruiser when she was visiting. About a week earlier, she parked it at the San Mateo CalTrain station and left the keys by the front tire, as she had done before. She usually told her father when she parked the Land Cruiser there, but she forgot to tell him on this occasion.

Within hours of talking to the Land Cruiser's owner, the police located the vehicle parked in San Mateo. Jackson was sleeping inside a sleeping bag in the front passenger's seat. After verifying the vehicle was still reported stolen, the police removed Jackson and handcuffed him. The wicker chairs were in the trunk, and the Land Cruiser's keys and registration were in Jackson's pocket. The owner and his daughter testified that they did not give Jackson permission to use the vehicle.

Jackson was charged with felony counts of unlawfully taking or driving a vehicle, second degree robbery, and receiving a stolen vehicle.[2] The jury convicted him of

_____

[2] The charges were brought under section 10851(a) (unlawfully taking or driving vehicle) and Penal Code sections 212.5, subdivision (c) (robbery) and 496d, subdivision (a) (receiving stolen vehicle). All further statutory references are to the Penal Code unless otherwise noted.

unlawfully taking or driving a vehicle and robbery. It did not return a verdict on the charge of receiving a stolen vehicle, however, having been instructed not to reach that charge if it found Jackson guilty of unlawfully taking or driving a vehicle.

The trial court found true allegations that Jackson had two prior serious-felony convictions, one in 1989 for robbery and one in 1997 for assault with a deadly weapon.[3] After granting his *Romero*[4] motion as to the strike findings under section 1170.12, subdivision (c)(1), the court sentenced him to 12 years in prison, composed of a term of two years for the robbery, a concurrent term of two years for the unlawful taking or driving of a vehicle, and two consecutive five-year terms under section 667, subdivision (a) for the prior convictions.

## II.
### DISCUSSION

### A.     *Jackson's Fair-cross-section Claim Is Meritless.*

Jackson first contends that his convictions must be reversed because he was denied his federal and state constitutional right to a jury drawn from a fair cross-section of the community. He maintains that this right was violated because no African-Americans were in the jury panel that was summoned to his courtroom. As he has come nowhere near satisfying his burden of showing a prima facie violation of the fair-cross-section requirement, his claim fails.

### 1.     Additional facts.

After jury selection began, Jackson filed a motion to dismiss the jury venire on the ground that it did not represent a fair cross-section of the community. In support, Jackson's trial counsel declared that recent U.S. Census Bureau data attached to the motion "revealed that 2.9% of the population of San Mateo County is estimated to be Black or African-American" and "the jury panel of 64 prospective jurors did not include

---

[3] Although Jackson thus had two prior convictions for violent or serious felonies, or strikes, in addition to the strike for the robbery conviction in this case, the prosecution elected to treat him as a two-strikes offender instead of a three-strikes offender.

[4] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

a single Black or African-American person." Jackson claimed this showing shifted the burden to the prosecution to justify the disparity, arguing that "[o]bviously, if a mix[] of voter registration and driver license/i.d. records does not bring Black or African-American citizens into our courtroom, then there is a systematic problem."

At a hearing on the motion, the trial court accepted the census data as evidence and agreed "that it does not appear that persons who were summoned to this particular department from the jury panel as a whole are African-American." The court observed that Jackson had not, however, presented evidence of the composition "of the group which appeared for the entire summoned jury panel," and his trial counsel admitted the defense had no evidence to offer on whether "there was a kink in the process somewhere in this particular case" of "culling DMV and voter registration records." Concluding that Jackson had failed to show a prima facie violation of the fair-cross-section requirement, the court denied the motion.

Jackson filed a motion for a new trial that raised several claims, including a renewal of his challenge to the jury venire's composition. He argued that a jury with at least one African-American member would not have convicted him of the robbery count, claiming the employee perceived him as "threatening" based solely on his race. Relying on a San Mateo County summons form, Jackson also identified for the first time a purported systematic flaw in the county's jury-selection process: that "potential jurors may obtain exemptions from jury service and continuances of their service without the involvement of the Court or input from the parties." The trial court rejected this claim, concluding that he still had not demonstrated "systematic exclusion" of the group in question.

2.      Discussion.

Criminal defendants have a right to a jury " 'selected from a fair cross[-]section of the community' " under both the federal and state Constitutions. (*People v. Henriquez* (2017) 4 Cal.5th 1, 18-19 (*Henriquez*); *People v. Ramos* (1997) 15 Cal.4th 1133, 1154.) " 'In order to establish a prima facie violation of the fair-cross-section requirement, [a] defendant must show (1) that the group alleged to be excluded is a "distinctive" group in

5

the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.' " (*Henriquez*, at p. 19.) If the defendant makes this showing, " 'the burden shifts "to the [People] to come forward with either a more precise statistical showing that no constitutionally significant disparity existed or . . . a compelling justification for the procedure which results in the disparity in the jury pool." ' " (*Ramos*, at p. 1154.) We review the trial court's application of the constitutional standard de novo and its factual findings for substantial evidence. (*Ibid.*)

It is undisputed that Jackson satisfied the first prong of a prima facie violation, because African-Americans are a distinctive group. (*Henriquez, supra*, 4 Cal.5th at p. 19.) We agree with the Attorney General, however, that the trial court correctly concluded the other two prongs were not satisfied.

As to the second prong, which requires showing an underrepresentation of the distinctive group in the venire, it is insufficient for a defendant to "show[] a disparity on the particular jury panel assigned to the court in which his or her jury is to be selected. Underrepresentation on the defendant's particular panel is *not relevant*." (*People v. De Rosans* (1994) 27 Cal.App.4th 611, 618, italics added.) Jackson never presented any evidence of the composition of the venire as a whole, resting only on the apparent absence of African-Americans on the panel in his courtroom. This deficiency alone defeats his claim.

As to the third prong, which requires showing a systematic exclusion of the group, " '[a] defendant does not discharge [his or her] burden . . . merely by offering statistical evidence of a disparity. A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process.' " (*Henriquez, supra*, 4 Cal.5th at p. 20.) Where, as here, the " 'county's jury selection criteria are neutral with respect to the distinctive group, the defendant must identify some aspect of the manner in which those criteria are applied that is not only the probable cause of the disparity but also constitutionally impermissible. . . . Speculation as to the source of the disparity is

6

insufficient to show systematic exclusion.' " (*Ibid.*) Even if the composition of Jackson's panel sufficed to establish a disparity, Jackson failed to identify any aspect of the jury-selection process likely to have caused it. The only "improper feature" of the process he identified was potential jurors' ability to avoid or delay their service "without the involvement of the Court or input from the parties," but he never explained why this circumstance would tend to exclude African-Americans, much less demonstrated that it *caused* the disparity.

On appeal, Jackson concedes that "under-representation in his . . . particular panel is not sufficient to demonstrate a constitutionally impermissible disparity" as required to meet the second prong of a prima facie violation. And although he reiterates that potential jurors can opt out of service without the involvement of the trial court or the parties, he still fails to explain how this feature systematically excludes African-Americans. Yet despite his admitted failure to establish a prima facie violation, he claims that the opt-out feature, combined with the fact that no African-Americans were brought into his courtroom, was "enough to shift the burden to the prosecution to demonstrate the lack of an actual disparity among the entire venire, and, if it could not do so, to demonstrate why compelling justification existed for the disparity." He offers no authority for his position, and the case law flatly contradicts it. The trial court properly concluded that he failed to show a prima facie violation of the fair-cross-section requirement.

> **B.**    *Jackson's Felony Conviction for Unlawfully Taking or Driving a Vehicle Cannot Stand.*

As we have said, Jackson claims that his conviction for unlawfully taking or driving a vehicle under section 10851(a) must be reversed because no evidence of the Land Cruiser's value was introduced, as required to support a felony conviction for theft of the vehicle under *Page*. The Attorney General concedes that the jury instruction on the charge improperly failed to inform the jury that it needed to find the vehicle was worth more than $950 to support a felony conviction based on theft of the vehicle. He argues that the error was harmless, however, because "it is clear beyond a reasonable

7

doubt" that the jury convicted Jackson of unlawfully driving the vehicle. We cannot agree. Despite the strong circumstantial evidence that Jackson drove the Land Cruiser, we are unable to conclude beyond a reasonable doubt that the verdict was necessarily based on this theory. (See *Chiu, supra*, 59 Cal.4th at p. 167.)

1.     Additional facts.

Count two of the information charged that, "[o]n or about September 12, 2016, . . . the crime of Driving Or Taking A Vehicle Without Consent in violation of [section 10851(a)], a Felony, was committed in that [Jackson] did drive a vehicle, [the Land Cruiser], without the consent of the owner, . . . and with the intent to deprive the owner of title and/or possession of the vehicle." The verdict form ultimately returned on this count stated that Jackson was guilty "of the crime of Unlawfully Taking or Driving a Vehicle, in violation of [section 10851(a)], a felony, as alleged in Count 2 of the Information filed herein." (Boldface omitted.)

The jury was instructed under CALCRIM No. 1820 that to prove Jackson guilty of violating section 10851(a), the prosecution was required to establish that "1. The defendant took or drove someone else's vehicle without the owner's consent; [¶] AND [¶] 2. When the defendant did so, he intended to deprive the owner of possession or ownership of the vehicle for any period of time." No unanimity instruction was given.

In closing argument, the prosecutor concentrated on the driving theory of guilt for the section 10851(a) charge, arguing that even though the employee had not explicitly testified that Jackson drove the Land Cruiser, the only reasonable inference was that Jackson drove the vehicle away after stealing the chairs. But the prosecutor also referred in his closing statement to a separate theory of guilt, which he sometimes referred to as "taking" and other times referred to as "possessing" the vehicle.

In explaining that Jackson could not "be found guilty of both" the section 10851(a) charge and the charge of receiving a stolen vehicle under section 496d, the prosecutor stated, "So even though it's basically the same conduct and they are related, driving the car or having possession of the car versus receiving it, the law says you can't be guilty of both taking something and then receiving it. . . . [¶] So there might

8

be a lack of proof as to the taking or the possession of the vehicle. If that's the case—I'm not saying there is, but I'm saying if there was, then you would sign the not guilty for [the section 10851(a) charge] and then move on to [the section 496d charge]."

And in addressing the elements of the section 10851(a) charge, the prosecutor stated, "Count 2, again this is CALCRIM [No.] 1820. It's the unlawful taking or driving—there is that word again, 'or'—of a vehicle. And then there is the Vehicle Code section which relates to what you see on the verdict form. [¶] So defendant took or drove the . . . vehicle without consent, and when he took it, he intended to deprive [the owner] of possession or ownership for any period of time. So it's not like he was just taking it briefly and you are going to give it back or something. Has to be you are going to actually take it and not give it back."

In urging that circumstantial evidence was sufficient to support a conviction, the prosecutor also said, "Common sense tells you that of course [Jackson] had possession of the vehicle and of course he also drove it. Remember, it has to be one or the other. [¶] Clearly, he possessed it. . . . [¶] . . . [¶] . . . It's [also] pretty clear that he drove the car away. That's one of the . . . ways to prove it. The other way is the possession of the stolen car."

Finally, in addressing the section 496d charge, the prosecutor said, "Remember I said before you can't be guilty of two different crimes if you steal something, take it and receive it. If for some reason you say, hey, [the prosecutor] did not prove Count 2 that [Jackson] either possessed or drove the stolen vehicle or that he didn't know it was stolen, if you think that's lacking, then you would sign that not guilty verdict form for Count 2 and then you move on to Count 3."

        2.     Discussion.

A violation of section 10851(a) is a "wobbler" offense that may be punished as either a misdemeanor or a felony. (*Page, supra*, 3 Cal.5th at p. 1181.) Under that provision, "[a]ny person who drives or takes a vehicle not his or her own, without the consent of the owner thereof, and with intent to either permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle . . ., is guilty of a

9

public offense." (§ 10851(a).) "[S]ection 10851(a) 'proscribes a wide range of conduct' " from stealing a car to joyriding. (*People v. Garza* (2005) 35 Cal.4th 866, 876 (*Garza*).) Because the provision "separately prohibits the acts of driving a vehicle and taking a vehicle . . ., a defendant who steals a vehicle and then continues to drive it after the theft is complete commits separate and distinct violations of section 10851(a)."[5] (*Id.* at p. 880.)

Under Proposition 47 (the "Safe Neighborhoods and Schools Act"), which went into effect before Jackson committed the crime here, " 'an offender who obtains a [vehicle] valued at [$950 or less] *by theft* must be charged with petty theft and may not be charged as a felon under any other criminal provision.' " (*Page, supra*, 3 Cal.5th at p. 1183; § 496, subd. (a).) The unlawful taking of a vehicle with the intent to permanently deprive the owner of possession is a theft offense, but the unlawful driving of a vehicle is not.[6] (*Page*, at p. 1183; *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 854 (*Gutierrez*).) Thus, some violations of section 10851(a) are punishable only as misdemeanors, and some are punishable as either misdemeanors or felonies. (*Page*, at p. 1183.)

We begin by agreeing with the parties that instructional error occurred. This error was eminently understandable since *Page* was not decided until several months after Jackson's trial. Still, if a felony conviction under section 10851(a) is "predicated on vehicle theft," the prosecution is "required to prove as an element of the crime that the [vehicle taken] was worth more than $950." (*Gutierrez, supra*, 20 Cal.App.5th at pp. 855-856; accord *People v. Bussey* (2018) 24 Cal.App.5th 1056, 1061-1062 (*Bussey*).) Here, the challenged instruction failed to include this directive and instead "allowed the

---

[5] We will use the term "posttheft driving" to refer to driving that "occurs or continues after the theft is complete"; driving that occurs during the taking is not a separate violation of section 10851(a). (*Garza, supra*, 35 Cal.4th at p. 871.)

[6] The unlawful taking of vehicle with the intent to deprive the owner of possession only temporarily—i.e., joyriding—is not a theft offense either. (*Page, supra*, 3 Cal.5th at p. 1183.) For the sake of simplicity, our subsequent discussion omits references to joyriding, because there is no evidence Jackson violated section 10851(a) in that way.

10

jury to convict [Jackson] of a felony violation of section 10851[(a)] for stealing the [Land Cruiser], even though no value was proved—a legally incorrect theory—or for a nontheft taking or driving offense—a legally correct one."[7] (*Gutierrez*, at p. 857.)

We therefore turn to consider whether the error was harmless. "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu, supra*, 59 Cal.4th at p. 167.) Unlike with other types of instructional error, prejudice is *presumed* with this type of error. "[T]he presumption is that the error affected the judgment: ' "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law . . . . When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." ' " (*In re Martinez* (2017) 3 Cal.5th 1216, 1224.)

This presumption of prejudice is rebutted only if the record permits the conclusion "beyond a reasonable doubt that the jury based its verdict on [a] legally valid theory."[8] (*Chiu, supra*, 59 Cal.4th at p. 167; see *In re Martinez, supra*, 3 Cal.5th at p. 1224.) Sometimes, " 'other aspects of the verdict . . . [will] leave no reasonable doubt that the

_____

[7] Relying on *In re D.N.* (2018) 19 Cal.App.5th 898, Jackson argues that his challenge can also be framed as a claim of insufficient evidence which, if successful, would bar retrial of the charge. (*Id.* at pp. 903-904.) We agree with the *Gutierrez* and *Bussey* courts that, at least where the evidence would have also permitted conviction on a theory not requiring proof of the vehicle's value, the issue is properly analyzed as one of instructional error. (*Bussey, supra*, 24 Cal.App.5th at pp. 1062-1063; *Gutierrez, supra*, 20 Cal.App.5th at pp. 857-858; compare *D.N.*, at pp. 900-901 [minor charged with "theft of a vehicle" and no evidence of posttheft driving].)

[8] The Second District Court of Appeal recently held, as to the principle requiring reversal absent a basis in the record to conclude the jury relied on a legally valid theory, that the "basis exists only when the jury has '*actually*' relied upon the valid theory [citations]; absent such proof, the conviction must be overturned—even if the evidence supporting the valid theory was overwhelming." (*People v. Aldemat* (2018) 20 Cal.App.5th 1149, 1153, review granted July 5, 2018, S248105.) We disagree with any suggestion that a finding of harmlessness requires affirmative proof of the jury's reliance on a legally valid theory.

11

jury made the findings necessary' under a legally valid theory." (*Martinez*, at p. 1226, quoting *People v. Chun* (2009) 45 Cal.4th 1172, 1205.) Other times, even if the verdict alone does not establish that the necessary findings were made, the evidence will leave no reasonable doubt that the jury made the necessary findings. Thus, an instruction on a legally invalid theory is also harmless " 'if it is impossible, upon the evidence, to have found what the verdict *did* find' " without also making the findings necessary under a legally correct theory. (*Chun*, at p. 1204.) The Supreme Court has left open the possibility that such error may be deemed harmless for other reasons as well. (*Id.* at pp. 1204-1205.)

The presumption of prejudice in this case has not been overcome. The Attorney General claims "it is clear beyond a reasonable doubt" that the jury convicted Jackson on a "valid posttheft driving theory" because "[t]he information showed a clear election by the prosecution to proceed on the driving theory." We are not convinced. True, the information charged Jackson with driving only, and the verdict form stated he was found guilty of the crime as alleged in the information. But CALCRIM No. 1820 allowed the jury to convict on either a taking or driving theory, and the prosecutor did *not* elect the driving theory in closing argument. (See *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 ["If the prosecution is to communicate an election to the jury, its statement must be made with as much clarity and directness as would a judge in giving instruction"].) Rather, the prosecutor mentioned both a taking theory and a "possessing" theory several times, the latter perhaps referring to the principle that "[m]ere possession of a stolen car under suspicious circumstances is sufficient to sustain a conviction of unlawful taking."[9] (*People v. Clifton* (1985) 171 Cal.App.3d 195, 200.) Given that both CALCRIM No. 1820 and the prosecutor's arguments gave the jury the option of convicting Jackson

---

[9] Possession was also relevant to the section 496d charge. As to that crime, the jury was instructed, "To receive property means to take possession and control of it. Mere presence near or access to the property is not enough." The prosecutor referred to "possessing" when addressing the section 10851(a) charge, however, so it is less likely he meant to refer to an element of the crime of receiving stolen property.

of unlawfully taking the Land Cruiser, the verdict form's wording does not allow us to conclude beyond a reasonable doubt that the jury relied on a driving theory.

The omission of a unanimity instruction raises additional doubts about the verdict's basis. A unanimity instruction is required where " 'one criminal act is charged, but the evidence tends to show the commission of more than one such act' " and the prosecution does not " ' "elect the specific act relied upon to prove the charge." ' " (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.) Although Jackson does not argue for reversal based on the omission of such an instruction, the prosecution's failure to clearly elect between taking and driving leaves the possibility that the jurors did not agree on the same act in returning the conviction. Thus, we cannot find the instructional error harmless unless we can conclude beyond a reasonable doubt that *not a single juror* relied on taking instead of driving to convict Jackson.[10] (See *People v. Melhado, supra*, 60 Cal.App.4th at p. 1539.) We cannot so conclude.

The Attorney General argues that a taking of the vehicle was "unsupported by any evidence," but we disagree. While the evidence of driving may have been stronger than the evidence of taking, substantial evidence was introduced to support a conviction for stealing the Land Cruiser, based on Jackson's possession of it under suspicious circumstances shortly after it was stolen. (See *People v. Clifton, supra*, 171 Cal.App.3d at pp. 199-200; see also *People v. Wissenfeld* (1951) 36 Cal.2d 758, 763-764 [sufficient

---

[10] Further confusing matters, the jury was improperly instructed under CALCRIM No. 3516 that the section 10851(a) and section 496d charges were "alternative charges" and that if it found Jackson "guilty of one of these charges, [it could not] find him guilty of the other." In fact, dual convictions under these statutes are barred only when a defendant is convicted of a theft offense under section 10851(a)—i.e., of "taking a car with the intent to permanently deprive the owner of possession." (*Garza, supra*, 35 Cal.4th at p. 876; *People v. Calistro* (2017) 12 Cal.App.5th 387, 401.) But if a defendant is convicted under section 10851(a) for a nontheft offense—either joyriding or posttheft driving—dual convictions *are* permissible. (*Ibid.*) Had the jury been correctly instructed on this point, its failure to return a verdict on the section 496d charge would demonstrate it relied on a theft theory to convict Jackson. Because of this instructional error, however, the jury's treatment of the section 496d charge sheds no light on the basis for the section 10851(a) conviction.

evidence to sustain conviction for theft of car where car found in defendant's possession 25 days after being stolen].)  Nor does the evidence permit us to conclude that no juror could have found that Jackson stole the vehicle without also finding that he engaged in posttheft driving.  (See *People v. Chun, supra*, 45 Cal.4th at p. 1205.)  The employee did not testify that he ever saw Jackson drive the Land Cruiser, Jackson was not driving the vehicle when the police discovered him, and there was no other direct evidence of driving that compelled the conclusion that if Jackson stole the vehicle, he also drove it after the theft.  In short, we are unable to conclude that the instructional error was harmless.[11]

We agree with the Attorney General that the appropriate remedy is to remand for the People to elect whether to retry Jackson on a felony charge or accept the conviction's reduction to a misdemeanor.  Therefore, following *Bussey* and *Gutierrez*, we will reverse the conviction, vacate the sentence, and remand for the People to make such an election. (*Bussey, supra*, 24 Cal.App.5th at pp. 1062, 1064; *Gutierrez, supra*, 20 Cal.App.5th at pp. 858, 863.)

C.       *Substantial Evidence Supports the Robbery Conviction.*

Jackson contends that insufficient evidence supports the robbery conviction because the record fails to establish that he "acted in a manner reasonably calculated to produce fear in [the employee]" to accomplish the theft of the chairs.  We are not persuaded.

To evaluate this claim, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict—i.e., evidence that is reasonable,

_____

[11] We are aware of other decisions that, relying on overwhelming evidence of posttheft driving, found harmless instructional errors related to the principle that a jury cannot convict a defendant of receiving a stolen vehicle if it convicts the defendant of theft of the same vehicle under section 10851(a).  (E.g., *Garza, supra*, 35 Cal.4th at pp. 880-882; *People v. Cratty* (1999) 77 Cal.App.4th 98, 100-103; *People v. Strong* (1994) 30 Cal.App.4th 366, 373-376; see also *People v. Calistro, supra*, 12 Cal.App.5th at pp. 394-396, 402-404.)  Although these decisions also involved the issue whether a section 10851(a) conviction was based on taking or driving, they are distinguishable for various reasons, including that the types of errors they addressed do not create a presumption of prejudice.

credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Robbery is defined as "the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (§ 211.) Jackson's challenge is limited to the sufficiency of the evidence to support the element of "us[ing] force or fear to take the property or to prevent the person from resisting." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) Because a robbery is ongoing "until the perpetrator has reached a place of temporary safety with the property," it is not necessary that force or fear be used to gain possession of the property. (*People v. Gomez* (2008) 43 Cal.4th 249, 255.) Thus, " 'a robbery [also] occurs when [a] defendant uses force or fear in resisting attempts to regain the property or in attempting to remove the property from the owner's immediate presence regardless of the means by which [the] defendant originally acquired the property.' " (*Id.* at p. 259.) This "includes forcing or frightening a victim into leaving the scene, as well as simply deterring a victim from preventing the theft or attempting to immediately reclaim the property." (*People v. Flynn* (2000) 77 Cal.App.4th 766, 771.)

There is no evidence that Jackson used force to effectuate the robbery, so we focus on the evidence of fear. As relevant here, fear is defined as that "of an unlawful injury to the person or property of the person robbed." (§ 212, subd. 1.) The required fear " 'is subjective in nature, requiring proof "that the victim was in fact afraid, and that such fear allowed the crime to be accomplished." ' " (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1319.) Even if a victim does not testify that he or she was afraid, a jury may infer that the defendant intimidated the victim, based on " ' " 'proof of conduct, words, or circumstances reasonably calculated to produce fear.' " ' " (*Ibid.*)

Because robbery requires "the specific intent to deprive the victim of the property permanently," " 'the act of . . . intimidation by which the taking is accomplished . . . must

be motivated by the intent to steal.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 994; see also *People v. Hardy* (2018) 5 Cal.5th 56, 90 [intent to steal must exist " ' "at the time the force or fear is applied" ' "].)  No specific intent "to cause the victim to feel fear" is required, however.  (*Anderson*, at pp. 991-992.)

Jackson argues that although the employee "testified that he was afraid, he never stated he was afraid because of [Jackson's] actions."  The record belies this contention.  The employee's testimony clearly indicated that (1) Jackson's movements and cursing scared him, (2) he was afraid Jackson would hurt him if he tried to reclaim the chairs, and (3) he did not try to reclaim the chairs because of this fear:

> [PROSECUTOR]:  After you told [Jackson] that the chairs belonged to you and then [Jackson] reacted by cursing and puffing [his] chest out, how did that make you feel?
>
> [EMPLOYEE]:  I was afraid.
>
> [PROSECUTOR]:  Afraid of what?
>
> [EMPLOYEE]:  It was over me because I'm injured and I couldn't do very much.  That's why I went quickly to go get help.
>
> [PROSECUTOR]:  When [Jackson] reacted that way, did you think that he was going to do something if you tried to get the chairs back?
>
> [EMPLOYEE]:  He could have, yes.
>
> [PROSECUTOR]:  My question is you just said you were afraid?
>
> [EMPLOYEE]:  Yes.  I was afraid.
>
> [PROSECUTOR]:  Were you afraid that [Jackson] was going to hurt you if you tried to get the chairs back?
>
> [EMPLOYEE]:  Yes.
>
> . . .
>
> [PROSECUTOR]:  If [Jackson] hadn't prevented you from getting the

16

> chairs back, what would you have done with the chairs?

    [EMPLOYEE]:       Take them to . . . work.

This testimony was more than sufficient evidence that Jackson's actions caused the employee's fear, which in turn enabled Jackson's asportation of the chairs.

Jackson also claims there was insufficient evidence he was motivated by an intent to steal when he "muttered and gestured" at the employee. He suggests his actions were not intimidating enough for the jury to conclude that he "acted in a manner reasonably calculated to produce fear," contrasting his actions to those of defendants in other cases who made a "demand" or "implied threat" under "intimidating circumstances." (E.g., *People v. Morehead* (2011) 191 Cal.App.4th 765, 775 [demands for money from victims contained "implicit threat of harm"]; *People v. Bordelon, supra*, 162 Cal.App.4th at p. 1320 [defendant pushed customer and made "escalating demands for money" during bank robbery]; *People v. Davison* (1995) 32 Cal.App.4th 206, 209-210 [defendant approached victim at ATM and told her to " ' "stand back" ' "]; *People v. Hays* (1983) 147 Cal.App.3d 534, 538-539, 541 [defendant, armed with rifle, entered victim's office through ceiling].) Even if these defendants' actions were more intimidating than Jackson's, it does not follow that Jackson's actions were therefore insufficient to prove an intent to steal. In response to the employee's verbal challenge, Jackson turned toward the employee, looked at him angrily, clenched his fists, and puffed out his chest. The jury could have reasonably inferred that Jackson did so to discourage the employee from interrupting his stealing of the chairs. Sufficient evidence supports the robbery conviction.

    D.     *The Trial Court Did Not Violate Jackson's Right to Self-representation.*

Finally, Jackson claims that the trial court erred by denying his request under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) to represent himself, entitling him to a new hearing on his motion for a new trial.[12] We are not persuaded.

---

[12] Jackson also argues that he is entitled to a new sentencing hearing, but he will receive one as a result of our reversal of his section 10851(a) conviction.

1.     Additional facts.

At the sentencing hearing, the trial court first heard arguments on Jackson's motion for a new trial. One of the claims his trial counsel discussed involved a supposed discrepancy between the photographs taken by the employee, which showed the Land Cruiser's hood was open, and the employee's testimony, in which he did not mention that the hood was open. As the court began to rule, the following exchange occurred:

> [JACKSON]:          Your Honor, he is fired. He is fired. Get it on the record. He is fired. [¶] . . . [¶] He is refusing to bring up the issue on these pictures.
>
> [COUNSEL]:          I think we may have a brief *Marsden*[13] in light of—
>
> [JACKSON]:          He is fired. Before you make any rulings, he is fired. I can do that.
>
> [COUNSEL]:          I think it will go very quickly.
>
> THE COURT:          I will ask—I will take Mr. Jackson's comments in court as his request for a *Marsden* hearing.
>
> [JACKSON]:          Yes, ma'am.

The trial court then held a *Marsden* hearing, at which Jackson expressed his belief that the photographs entitled him to a new trial for a different reason: the Giants jacket in the photographs was different than the one he was wearing when arrested, raising an identity issue. After the court interrupted him, he indicated he "want[ed] to go pro per" and wanted to file a motion to disqualify the judge. Reminding Jackson that it was a *Marsden* hearing, the court directed him to air his complaints about counsel. Jackson did so, and the court then denied the *Marsden* motion.

After the parties reconvened, Jackson's trial counsel said he understood Jackson to be making "a *Faretta* pro per request" and a motion to disqualify the judge. The trial court denied both motions. As to the *Faretta* request, the court explained that "a

---

13 *People v. Marsden* (1970) 2 Cal.3d 118.

defendant does have a constitutional right to represent himself. However, it is not absolute. The court is empowered with the discretion . . . to evaluate circumstances under which it may not be timely. To make such a motion in the middle of sentencing after expressing dissatisfaction with his attorney[,] indicating dissatisfaction with the direction in which the sentencing may be going[,] is not in my opinion timely." The court then denied the motion for a new trial and sentenced Jackson.

        2.       Discussion.

Criminal defendants have a federal constitutional right to represent themselves, including at sentencing. (*Faretta, supra*, 422 U.S. at p. 807; *People v. Doolin* (2009) 45 Cal.4th 390, 453.) "The right to self-representation is absolute, but only if a request to do so is knowingly and voluntarily made" and timely asserted. (*Doolin*, at p. 453.) "Otherwise, requests for self-representation are addressed to the trial court's sound discretion." (*Ibid.*) Jackson concedes that his request for self-representation was untimely. (See *People v. Miller* (2007) 153 Cal.App.4th 1015, 1024 [request must be "made within a reasonable time prior to commencement of the sentencing hearing"].) We therefore review the trial court's ruling for an abuse of discretion. (*People v. Smith* (2018) 4 Cal.5th 1134, 1182.)

The timeliness requirement is meant to ensure that a defendant does not "misuse the *Faretta* mandate as a means to unjustifiably delay a scheduled [hearing] or to obstruct the orderly administration of justice." (*People v. Windham* (1977) 19 Cal.3d 121, 128, fn. 5 (*Windham*).) To this end, relevant factors in evaluating an untimely request for self-representation include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Id.* at p. 128.)

Here, several of the *Windham* factors strongly supported denial of the request for self-representation. In denying the *Marsden* motion, the trial court found that Jackson's trial counsel had acted "well within the range of professional responsibility for an attorney." In addition, Jackson asked to represent himself only after making that

unsuccessful motion. Although he claims that his attempt to "fire" counsel was misconstrued as a *Marsden* motion instead of a *Faretta* request, he agreed when the court said it interpreted his statements as a request for a *Marsden* hearing. Thus, Jackson's primary aim appeared to be removing counsel, whom he was angry with for not raising another basis for the new-trial motion, not representing himself.

In addition, over three months passed between the verdict and the hearing at issue, yet Jackson did not bring up his dissatisfaction with his representation until after the motion for a new trial had been argued and the trial court was on the verge of ruling on it. The court could have reasonably construed the *Faretta* request, coming as it did in conjunction with the *Marsden* motion and motion to disqualify the judge, as a last-ditch attempt to avoid denial of the new-trial motion.

Jackson argues that the trial court's "failure to inquire as to [his] readiness to proceed with the hearing preclud[ed] a finding that his request for self-representation was made for purposes of delay or to obstruct the orderly administration of justice." We disagree. Even if Jackson had said he was ready to proceed, the trial court would not have been compelled to grant the *Faretta* request. Although such readiness may have weighed in favor of granting the request, he provides no authority suggesting this factor is dispositive. Similarly, he points to no cases suggesting that a court is required to thoroughly consider *all* the *Windham* factors before making a determination. To the contrary, reviewing courts have upheld denials of untimely *Faretta* requests so long as two *Windham* factors strongly supported the rulings. (E.g., *People v. Smith, supra*, 4 Cal.5th at p. 1182; *People v. Mayfield* (1997) 14 Cal.4th 668, 810.) And even if granting Jackson's request would not have required a continuance, the court could still have reasonably concluded that allowing him to represent himself would be disruptive, based on his outbursts during the hearing. (See *People v. Howze* (2001) 85 Cal.App.4th 1380, 1397-1398 [untimely *Faretta* request properly denied based on defendant's previous behavior in court].) There was no abuse of discretion.

Moreover, Jackson fails to demonstrate a reasonable probability that he would have achieved a more favorable result had he been allowed to represent himself. (*People*

20

*v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Rogers* (1995) 37 Cal.App.4th 1053, 1058 [erroneous denial of untimely *Faretta* request assessed for prejudice under *Watson*].)  He claims that, "acting as his own zealous advocate, [he] would have certainly been successful in getting the [trial] court to take a closer look at the disputed photographs and render a more considered ruling," and the additional "consideration may have then resulted in a favorable ruling, or an even greater reduction in sentence."  But the basis for a new trial that he wished to raise was unlikely to succeed, as the court indicated during the *Marsden* hearing by expressing its belief that the Giants jacket in the photograph was "similar, if not identical, to the jacket that [Jackson] was wearing when he was arrested."  Nor does Jackson explain how the court's closer consideration of the motion for a new trial would have resulted in a more favorable *sentence*.  Thus, even if there had been an error, it was harmless.

III.
DISPOSITION

The conviction for unlawful taking or driving of a vehicle under section 10851(a) is reversed, the sentence is vacated, and the matter is remanded for further proceedings consistent with this opinion.  On remand, the People may elect to accept a reduction of the section 10851(a) conviction to a misdemeanor, in which case the trial court is to resentence Jackson accordingly, or to retry him for a felony violation of section 10851(a).  In all other respects, the convictions are affirmed.

_____

Humes, P.J.

We concur:

_____

Dondero, J.

_____

Banke, J.

Trial Court:

San Mateo Superior Court


Trial Judge:

Hon. Lisa A. Novak


Counsel for Defendant and Appellant:

Jonathan Soglin; Executive Director, First District Appellate Project

Stephanie Clarke; First District Appellate Project


Counsel for Plaintiff and Respondent:

Xavier Becerra; Attorney General

Gerald A. Engler; Chief Assistant Attorney General

Jeffrey M. Laurence; Senior Assistant Attorney General

Eric D. Share; Supervising Deputy Attorney General

Leif M. Dautch; Deputy Attorney General